CASPER H. SCHURMEIER VS. THE ST. PAUL AND PACIFIC RAILROAD COMPANY et al.

In 1849 the United States by patent conveyed to Louis Roberts Lot one in Section five in Ramsey County, which lay on the left or northerly bank of the Mississippi River. The meander line of said lot was run along the left or northerly bank of a small channel or slough between said bank and a parcel of land subsequently surveyed by the government designated "Island No. 11." In very low water in the river, there was no current and very little water, and that in pools, in said channel or slough. At a medium stage of water in the river, the land designated "Island No. 11" was above water, and there was a current or flow of water through said channel or slough. In very high water in the river said Island No. 11 was inundated. At and prior to the time of pur-

Schurmeier v. The St. Paul and Pacific R. R. Co. et al.

chase of said lot by Roberts, the government plat kept in the local land office, which showed the boundaries and descriptions of the public lands, and in accordance with which sales were made, showed no islands in the river in section five or opposite said lot. *Held*—that the river and not the meander line was the boundary of said lot. That by the patent to Roberts the United States conveyed the title to the land, at least to low water mark—including that designated "'Island No. 11."

After Roberts obtained title to said lot, he platted it into blocks, lots, streets, landing, &c., as a part of the town of St. Paul, and duly recorded his plat thereof. *Held*—that he retained in the land over which the streets and landing were laid, the fee, subject only to the use of the public for the purposes designated.

That the Legislature could not appropriate the land laid out into streets and landing for any other use, or subject it to any additional servitude without compensation to the owner of the fee. That the use by the Railroad Company of the landing or streets for a railroad track was unauthorized by the dedication or the law under which it was made.

That the Railroad Company having no legal authority to use the streets or landing for a railroad track, and such use being a special injury to the plaintiff, he is entitled to an injunction.

The plaintiff, claiming to be the owner of lots 11 and 12 in block 29, St. Paul, brought this action in the Ramsey County District Court to restrain the Saint Paul and Pacific Railroad Company, its agents and employees, from constructing and maintaining its railroad upon the street and levee in front of said lots, and which separate them from the Mississippi River.

Issue was joined in the action, the said Company claiming the right to so construct and maintain such railroad under and by virtue of the following statutes :

1. The act of Congress granting lands in alternate sections (sections of the odd numbers) to the Territory of Minnesota to aid in the construction of certain railroads therein, &c., passed March 3, 1857.

2. Chapter 1 of the act of the Legislative Assembly of the Territory of Minnesota to execute the trust created by the said act of Congress, and to grant certain lands to railroad companies therein named, passed May 22, 1857.

3. Amendment of section ten of article nine of the Constitution of the State of Minnesota, adopted April 15, 1858.

4. An act concerning Land Grant Railroads, passed August 12th, 1858, and an act in addition thereto passed the same day.

5. An act to facilitate the construction of the Minnesota and Pacific Railroad, and to amend and continue the act of incorporation relating thereto, passed March 10, 1862.

6. An act of Congress to grant the right of way to all rail and plank roads through the public lands of the United States; passed August 4, 1852.

7. An act to extend the provisions of the last above mentioned act to the public lands in the Territories of the United States, passed March 3, 1855.

The cause was tried before a Referee, who in his report finds the facts substantially as follows:

The premises in question are included in that part of section 5, Town 28, north of Range 22, west of Fourth Principal Meridian, which is situate on the left or north side of the centre line of the Mississippi River. The said part of section five, consists of two separate triangular parcels of land, one of which, lot two thereof, is situated in the northeast corner, and contains one and thirty-three-hundredths acres, and the other lot one thereof in the northwest corner of said section, containing nine and twenty-eight-hundredths acres, and including said lots eleven and twelve. A government survey of said part of said section five, was duly made October 27, 1847, and a map or plat of said section pursuant to such survey was duly prepared from the field notes and certified March 13, 1848, and was duly transmitted to the land office in the district in which such lands are situated; said map does not indicate that there were any islands in the river in said section five, but does indicate an open river without islands, and that the meander line of said lot one was the border line of the Mississippi River. When this survey was made, the meander line of said lot one was run along the left or northerly bank of a small channel or slough between said bank and an island which appeared in said river, except in times of very high water. In very low water

there was no current and very little water, and that in pools, in said channel or slough; at a medium stage of water said island was above water, and there was a current or flow of water through said channel or slough, and in very high water said island was inundated; no mention of said channel or slough, or of said island, is made in the field notes of said survey, but such field notes show that the line that bounds lot one on the north runs east until it intersects the left bank of the river, at which point a post is set called a "meander corner"; that the line bounding said lot on the west runs south until it intersects the left bank of the river, at which point also a meander post is set. The meander line of the river between these points commences at the first above mentioned meander post and runs " *thence up stream*" (the courses and distances being given) to the last mentioned meander post.

Prior to March 24, 1849, Louis Roberts purchased said lots one and two of the United States, and on that day a patent therefor was duly issued to him, whereby the United States did give and grant to the said Roberts said lots, containing ten and sixty-hundredths acres according to the official plat and survey thereof. In the spring of 1849 said lot one was duly surveyed, laid out and platted into town blocks, lots, streets, &c., constituting a part of the town of St. Paul, and such plat was duly certified and recorded. The said survey and plat of said town included the land embraced in said lot one, and extended to the main channel of said river, without regard to the meander line of said lot; the said lots eleven and twelve in block twenty-nine are included in said plat and survey of said town, and are so designated by and upon such plat; the larger part of said lots eleven and twelve (about two-thirds) is situated south of the meander line of lot one in section five, extending across said slough, the front or southerly line of said lots being on said island. All that parcel of land lying between the front or southerly line of said lots eleven and twelve in said block twenty-nine, and the main channel of the said river, as well as the like space between the front line of the balance of said block twenty-nine and the blocks west of it, is on said town plat

designated "Landing." On the 13th of March, 1856, the piece of land lying between the said channel or slough and the main channel of said river—said island—was surveyed under instructions from the Commissioner of the General Land Office, dated February 21, 1854, and such survey was duly approved, and a map thereof made and duly certified, and recorded September 24, 1856, upon which map said island is designated "Island No. 11." Prior to such survey of "Island No. 11," the city of St. Paul had, in grading the levee or landing between said block twenty-nine and the river, entirely filled said channel or slough at the upper or west end thereof, and extended the grade entirely across said "Island No. 11" to the main channel of the river. The surface of said island in its natural condition was about four feet lower than the main land. In 1860 or 1861 the plaintiff built a warehouse on the west side of said lot eleven, in block twenty-nine, extending entirely across said slough or channel, the larger part thereof being south of the meander line of said lot one, and the front or south end of said warehouse on said "Island No. 11," and about four feet back or north from the front or, southerly line of said lot eleven. In erecting said warehouse, plaintiff fixed the elevation or level of the lower floor with reference to the grade of said levee or landing, as established by said city. Prior to the erection of said warehouse, the title in fee to said lots eleven and twelve passed from the said Louis Roberts through intermediate conveyances to the plaintiff, who at the time of the commencement of this action and the commencement of the railroad works hereinafter mentioned, was the owner thereof, and seized of the title thereof in fee, with the appurtenances, to the extent which Louis Roberts received the title thereto from the United States, and to the extent of his right and power to convey the same. Ever since the survey and plat of said town of St. Paul, the space between the main channel of said river and the town blocks fronting thereon, and designated on said plat as "Landing," has been used as a public landing or levee for steamboats and vessels touching at St. Paul, and plying between that place and other places on the Mississippi River and its tributaries, which landing includes the

space between said lots eleven and twelve, in said block twenty-nine, and the main channel of the river.   In the fall of 1862 said Railroad Company entered upon that part of said landing or levee, lying between the plaintiff's warehouse and the main channel of said river, for the purpose of constructing their railroad track thereon for permanent and continued use, and were engaged in such work when this action was commenced.   The defendants, other than said Company, were its employees, directing and doing said work, and since the commencement of this action such work has been completed.   The said Company have raised the grade of said levee in the construction of their railroad, so that the top of the rails thereof is twenty-one and one-half inches higher than the lower floor of the plaintiff's warehouse, and the north rail of the track is fifty and three-tenths feet from the front wall of said warehouse.   There are two tracks there on a level with each other, or nearly so, and the grade from the south side of the south track to the water is much steeper than the former grade of the levee between the plaintiff's warehouse and the water.   The said railroad works of the said Company, and the use thereof, are an obstruction to the plaintiff in the use of his warehouse in connection with the navigation of the Mississippi River, and will continue to be such an obstruction so long as the said works shall there remain.

Although the plaintiff may derive benefit from the construction of said railroad, in common with the other owners of real property adjacent thereto, such obstruction is an injury personal to himself, and distinct from the injury (if any) to the public occasioned by the construction and use of said railroad on said levee. The whole of said railroad works of said Company, and of which the plaintiff has complained in this action, are located upon "Island No. 11" in said section five.

The Referee found as a question of law that the plaintiff was entitled to the relief demanded in his complaint, and in pursuance thereof a judgment was entered up in his favor, perpetually enjoining the defendants from constructing, maintaining and using

said railroad, &c., in front of said lots eleven and twelve. The defendants appealed from such judgment to this Court.

MASTERSON & SIMONS for Appellants.

I.—The lines run and marked by the Surveyor upon the bank of the Mississippi river, commonly called the "meander lines," are the boundaries upon that side of the lands granted to Roberts and of all claiming under him.

1. It is a case of the sale of land by special metes and bounds, artificially run and marked upon the ground. *Act of Feb.* 11*th*, 1805, *Sec.* 2, 2 *U. S. Stats.*, 313, *&c.*, (*Land Laws*, 119, *&c.*) ; 2 *Barr.*, (*Penn. State Rep.*) 43 ; 4 *Barr.*, 244 ; 10 *Casey*, (*Penn. State Rep.*) 198 ; *Davis vs. Rainsferd*, 17 *Mass.*, 208 ; 13 *Pick.*, 145 ; *Jackson vs. Hathaway*, 15 *J. R.*, 447 ; *Childs vs. Starr*, 4 *Hill*, 369 *and* 373, *and the cases there cited per Walworth; Bradford vs. Currey*, 45 *Maine*, 9 ; *Saunders vs. McCracken, Harden* (*Ky.*) *Rep.*, 258; *Yaden vs. Swope*, 3 *Bibb.*, 204 ; *Bodly vs. Kerndon*, 3 *Marshall*, 21 ; *Fleming vs. Keeney*, 4 *J. J. Marshall*, 157 ; *Mercer vs. Bates*, 4 *Id.*, 339 ; *Bruce vs. Taylor*, 2 *Id.*, 160 ; *Bates vs. Ill. Cent. R.R. Co.*, 1 *Black.*, 204.

The acts of Congress providing for the preservation of the *field notes* of the surveys, show that they are to be regarded as *calls for boundaries*, and that their purpose is not merely to furnish data for the computation of the quantity and price. *See act of* 12*th of June*, 1840, 5 *U. S. Stat.*, 384, *and act of* 22*d of Jan.*, 1853, *Secs.* 1 *and* 2, 10 *U. S. Stat.*, 152.

There was no authority for the sale of the *locus in quo* at the time of Roberts' entry, because it had not then been surveyed and platted, or included in returns made to the General Land Office. See dissenting opinion of *Ch. J. Wilson*, 2 *Scam.*, 510.

There was no authority to fix the price by one boundary, and sell by a different boundary. But the line by which the price to be paid by the purchaser is determined, is for that reason the line by which he shall hold his title. To hold differently is to invite fraud upon the Government.

2. If it is to be considered as a sale of lands bounded upon the river generally as a natural boundary, the result will be the same. Because the Mississippi river at the place in question, "is a deep and navigable public stream of water on which a large amount of commerce and trade are carried on." *See the plaintiff's complaint.* Therefore the grant would stop at the edge, and not go to the middle thread.

At common law a boundary upon a navigable stream, conveyed only to the edge at high water. The material fact in the eye of the law is navigability, and not what causes or proves it to be navigable. It is the quantity, not the quality, of freshness or saltness, that is the material thing. If the navigability is disputed, the ebbing and flowing of the tide is strong *prima facie* evidence to support the fact of navigability; but it is not conclusive even as evidence, and as a test it was never anything more than a rule of evidence, as distinguished from a rule of right or property. Public use for the purposes of commerce was higher and more conclusive evidence of navigability in fact, which was the real question in law.

The rule in regard to the ebbing and flowing of the tide, like all rules of presumption, depends for its force upon its agreement, as a general rule, with the facts. In England this presumption is generally true in fact—it is probable. In this country the reverse is true and probable. The principle of the rule is to presume what is probable until the contrary is shown, and the law is the same in both countries in this, that in both countries we presume that which is probable. We adhere to the principle and reason of the law, and in order to do so have to reverse the presumption, because the facts in regard to our rivers are the reverse of those in England.

The reason of the common law limiting grants of land bordering navigable streams to the edge of them, is that public policy requires that land which ordinarily has no value except for use in connection with public commerce, and may come to have great value for that use, should not pass by grants upon the banks to private persons, but should be held by the public, or those to whom

it has been expressly granted by the public, for reasons connected with their interests.   No other reason can be given why the grant stops at high water mark, and denies the ownership of the shore and portions covered by shallow water, to the riparian proprietor. For these parts cannot be used by vessels navigating, and are only valuable to erect commercial buildings and docks upon.   The Mississippi is within the reason and policy of the common law rule as to tidal waters.   *See* 1 *Cowper*, 86 ; 4 *Barn. & Cress.*, 598 ; 5 *Taunt.*, 706 ; *Woolrych's Law of Waters*, 62, 63, 64, *and the cases there cited ; Opinions of Mr. Justice Bronson in Starr vs. Child*, 20 *Wend.*, 158, *and the cases cited by him ;* 2 *Wharton*, 508 ; 2 *Binney*, 475 ; 14 *Sergt. & Rawle*, 71 ; 14 *Penn. State R.* 171 ; 10 *Casey's Penn. State Rep.*, 198 ; 3 *Clarke's* (8 *Iowa*,) *R.*, *page* 1 *and cases there cited ;* 2 *Den.*, 30, 36 ; 4 *Hill*, 369, *per Walworth ; Orendorf vs. Steele*, 2 *Barbour, Sup. Ct., N. Y.*, 126.

3. Whatever may be the strict common law rule, this case arises under the United States Land Laws, and is controlled by them ; and by those laws the Mississippi is navigable in law, and grants of land bordering upon it are limited to the surveyed lines where there are any, and in their absence to the edge of the stream.   *Act of May* 18, 1796, *Land Laws, page* 50, 1 *U. S. Statutes*, 464 ; *act of May* 20, 1785, *do. p.* 11 ; *act of June* 1, 1796, *do. p.* 56 ; *act of March* 3, 1803, *do. p.* 98, *sec.* 17 ; *act of March* 26, 1804, *do. p.* 107, *sec.* 6 ; *act of Feb.* 11, 1805, *do. p.* 119–20, *secs.* 2 *and* 3, 2 *Stats.*, 313 ; *act of April* 24, 1820, *do. p.* 323–4, *secs.* 1 *and* 3, 3 *Stats.*, 566 ; *act of March* 3, 1847, 9 *Stat.*, 179 ; *act of April* 16, 1814, *Land Laws*, 245, *Sec.* 3 ; *act of Feb.* 27, 1815, *do.*, 257, *sec.* 1 ; *act of April* 16, 1816, *do.*, 273, *sec.* 2 ; *do. April* 27, 1816, *do.* 276, *sec.* 2 ; *do. March* 3, 1847, *vol.* 9, *stats. at large, p.* 691, *or page* 43 *of private laws, same vol. ; see also vol.* 5, *page* 70, *and vol.* 10, *pages* 157 *and* 601 ; *Child vs. Starr*, 4 *Hill*, 369 ; *Id.* 5 *Denio*, 599 ; 1 *Peters' C. C. Rep.*, 64 ; 4 *Mason's Rep.*, 349 ; 3 *Sumner*, 170 ; 6 *Mass.*, 435 ; 17 *Mass.*, 298 ; 13 *Pick.*, 145 ; 7 *Porter*, (*Ala.*) 428 ; 2 *Id.*, 436 ; 6 *Humph.*, (*Tenn.*) 358 ; *Russell vs. Empire State*, 1 *Newberry*, 551 ; 6 *Miss.*, 219 ; *Walker's Ch. Rep.*, 155 ; 1 *Minn.*, 73; *Jones vs. Sculard*, 24 *How.*, 41 ; *Oren-*

Schurmeier v. The St. Paul and Pacific R. R. Co. et al.

*dorf vs. Steele*, 2 *Barb. Sup. Ct. Rep.*, (*N. Y.*) 126; *Bates vs. Ill. Cent. R. R. Co.*, 1 *Black.*, 204.

In every instance of the use of the term "navigable" in the land laws, it is used in the largest sense, meaning navigable in fact for the purpose of trade and commerce. Not an instance can be found of its use in the restricted sense of waters, where the tide ebbs and flows.

The same acts which provide for the survey, provide also for the sale of the lands and regulate the title, and the term "navigable" must be taken in the same sense, whether the question be one of survey, or of the extent of the title granted upon the survey.

The only authority given for deviating from the rectangular form of survey, and for making fractional sections on account of rivers, is because of their navigability rendering it "impracticable" to adhere to the usual mode. *Act of* 1796. If it is not for that reason "impracticable," the lines must be extended across the streams, and the square form adhered to, and the bed of the river included and to be paid for. If this reason did not exist in this case, the survey into a triangular form was illegal, and Roberts' title a nullity. If the river is not navigable in the sense of the term which the United States have adopted in the laws by which their lands are granted and titles interpreted, then the Surveyor had no more right to meander it than he would the smallest rivulet or even a prairie.

For the purposes of determining questions of titles and boundaries, the meandering of a river and not the ebb and flow of the tide, is the test or evidence of navigability.

The word "impracticable" in the land laws, (*see act of May* 18, 1796, *sec.* 2; *act of* 1785 *from which it is copied*), is not to be understood in the sense of physical impossibility or inconvenience, but in the sense of the impropriety of including within the bounds of the subdivisions offered for sale portions of land not intended to be sold, and the confusion which would arise from selling to private persons lands by boundaries, which included some lands the fee of which it was the design and policy of the law to retain

in the public.   It is the same impracticability that there would be in extending the divisions and lines of the survey so as to include lands reserved for the use of the Indians ; and the same impracticability that there would be in extending the lines so as to include land covered by tide waters, or the shore between high and low water.   There was no other impracticability encountered.   If "impracticable" is taken in the physical sense, it is encountered at the edge of the water.

It is in fact the same word which is used to reserve from sale the bed and shores of this same river in a part of its course—where it is affected by the tide.   There is no other authority for reserving them anywhere in its course.

The use of the same word for rivers where there is a tide and those where there is not, shows an intention to reject the common law distinction.   And this word being also used in connection with the Indian boundary line, and taken from the act of 1785, which made no reference to rivers, shows that the design was the exclusion of the soil from sale.

It is evident from the *9th section of the act of May*, 1796, that Congress did not consider the common law applicable, nor desire that it should be. · For it adopts a rule unknown to that law for streams that are not navigable.   *The act of March* 3, 1847, vesting in the city of Madison the strip of land between the meander line and the Ohio River, is a legislative construction put upon the existing laws of Congress, which should be followed in regard to all subsequent sales, especially as the act extending the land laws over the Chippewa Land District and the *locus in quo*, was passed the same day.

Whatever may be the common law interpretation of the words " to the water course," their meaning in the *2d sub. of the 1st sec. of the act of Feb.* 11, 1796, and similar requirements in other acts, is to the *edge*, and not the *middle*, because they are used in connection with and to carry out the requirement that the lines shall in all cases run *due* north and south, or east and west " to the water course," &c.   Now, in many cases it is impossible, owing to the curvatures in the water courses, to do this if the

middle thread· is intended, but is in all cases possible if the edge is meant.   And this is so in the case at bar.

Even where it is possible to do it in one case, it would be at the cost of preventing the like right in an adjoining case.

It is evident from the plat of the original survey, that there was no intention of representing the whole river in its entirety, or the middle thread of it, as a boundary.

All boundaries are lines in the mathematical sense—length without breadth, where the intention is to represent a boundary as on or by a river generally, or the middle thread thereof.   Either the whole river is represented as one line—not as a space between two lines, or the middle is represented by a dotted line.

In this case the river, though not represented by a single line, is platted and represented as having but one side, and therefore, no middle thread at all.

It is just such a map as we would expect when the· intention was to represent the land as bounded by the edge instead of the centre. .

And the certificate of the Surveyor General to the map, shows that it was intended to represent and describe only land lying upon the east side or left bank, and that it was strictly conformable to the field notes.   That is, it is to be taken as a plat and representation of that land, and that only of which such field notes are the more particular description.

This is similar to the description in the deed of cession by Virginia to the United States of the territory on the north-west side of the River Ohio, and which was held not to carry the bed of the river or islands.   *Handley's Lessee vs. Anthony*, 5 *Wheaton*, 379.

II.—If the *locus in quo* does not belong to the respondent, then the appellants are rightfully there, and justified in their acts. *Laws of Minnesota, Extra Session*, 1857, *page* 3 *and* 2; *Act of March* 3, 1857, (*Land Grant Act*); *do. August* 4, 1852, 10 *U. S. Statutes*, 28; *do. March* 3, 1855, 10 *do.*, 683; *do. July* 15, 1862; *Rex vs. Smith*, 1 *Doug.*, 425; *Gould vs. Hudson River R. R. Co.*, 2 *Selden*, 522; *see also Sec*. 3, *Charter of the Co. Laws of* 1857, *page* 4.

III.—If Roberts by his Patent became the owner, then he parted with the fee of the *locus in quo,* by recording his town plat. *Statutes of Wisconsin,* 159, *Sec.* 5. And the public in whom the fee became vested have authorized its use by the R. R. Co. 2 *Smith's Leading Cases,* 186, *and the cases there cited ; 7 Barbour, (Sup. Ct., N. Y.) Rep.,* 509 ; *B. Munroe,* 437 ; 6 *Wharton,* (*Pa.*) 43, *&c. ; Statutes of Minnesota, Extra Session,* 1857, *page* 6, *Sec.* 7, (*Charter of the Co.*)

IV.—The respondent is not entitled to the remedy by injunction ; but must resort to the remedy provided by the Charter of the Company, (*Section* 13, *Laws of* 1857, *Extra Session, pages* 10 *and* 11,) or to his general legal remedy.

The Court should presume that the remedy especially provided by the Legislature is adequate, until it has been tried or some facts are alleged from which the Court can infer that it would be useless to resort to it.

The Railroad in question is "a public highway for the use of the Government of the United States." *Act of March* 3*d,* 1857, *Secs.* 3 *and* 5, *U. S. Stats., Vol.* 11, 195–6, *and Charter of the Company.*

Lorenzo Allis for Respondent.

I.—Inasmuch as the plaintiff owns the property in front of which the railroad is being constructed, and also the fee of the ground on which the defendants have entered and are erecting their works, he may enjoin them from thus appropriating and using his private property, unless just compensation therefor be first paid or secured to him. *Constitution of Minnesota, Art.* 1, *Sec.* 13 ; *Art.* 10, *Sec.* 4; *Constitution of the U. S., Amendments, Art.* 5 ; *Bonaparte vs. Camden and Amboy R. R. Co.,* 1 *Baldwin, C. C. Rep.,* 205, *and cases there cited ; Bradshaw vs. Rogers,* 20 *Johns.,* 103 ; *Bloodgood vs. Mohawk and Hudson River R. R. Co.,* 18 *Wend.,* 9.

II.—But the respondent's suit is mainly a suit to abate a public nuisance. The right of an individual, who is specially injured by

Schurmeier v. The St. Paul and Pacific R. R. Co. et al.

a public nuisance—as the obstruction of the highway, or street, in front of his house or place of business, or other property—to an injunction at his own suit, is clearly established by the authorities. *See Humphreys & Terry vs. St. Paul & Pacific R. R. Co., now pending in the U. S. Circuit Court ; see also, Angell on Highways, page* 263, *Sec.* 283, *and cases there cited ; Angell on Water Courses, page* 631, *Sec.* 571–2 ; 2 *Story's Eq. Juris., Secs.* 920–9; *Angell on Highways, page* 199, *et seq.; Angell on Water Courses, page* 616, *et seq.; Soltau vs. De Held,* 9 *Eng. Law and Equity,* 104; *Corning vs. Lowerre,* 6 *Johns. Ch.,* 440 ; *Catlin vs. Valentine,* 9 *Paige,* 575.

In the case at bar there are two aspects, in which the acts and works of the defendants are a public nuisance :

1. The defendants are obstructing a public street.

The act of incorporation does not authorize the obstructions complained of and found by the Referee to exist in this case. *See Sec.* 7 *of said act.* There is no act of the Legislature authorizing these obstructions.

2. The defendants are obstructing a public landing on a navigable river.

Now it is not in the power of the Legislature of Minnesota, even if they were so disposed, to authorize these obstructions upon the public landing of a great national highway of commerce, like the Mississippi River. The people of Wisconsin, Iowa, Illinois, Missouri, and other States of the Union, have just the same interests and rights in the freedom of the navigation of this river, and the unobstructed use of its banks and public landings within this State, as the people of Minnesota. Any attempt, therefore, on the part of the people or the Legislature of Minnesota, to the exclusive use and occupation of the banks and landing places of this river, within the territorial jurisdiction of the State, would be futile and nugatory. If the several States could each within its jurisdiction assume the exclusive use and occupancy of the banks of the great navigable streams flowing through their Territory, or could grant such exclusive use and occupancy to others, there would be an end to the freedom of the navigation of these streams. In fact they

would no longer be navigable streams, as the acts of Congress explicitly declare that they shall be, and as the highest tribunal of the country has frequently adjudicated that they are. *Constitution of the U. S., Art. 4, Sec. 2; Ordinance of 1787, Art. 4, last clause; Act of Congress of 18th May, 1796, Sec. 9; 1 Stat. at Large, 468; Brightly's Dig., page 500, Sec. 232; Russell vs. Brig Empire State, 1 Newberry, 541; Genesee Chief, 12 How., 443; Corporation of Memphis vs. Overton, 3 Yerg. (Tenn.,) R., 389.*

It is therefore confidently submitted that in no contingency can the obstructions, which it is found the defendants have put upon the public landing in front of the plaintiff's property, ever be other than a public nuisance; and that therefore the plaintiff must at all times have the right to his remedy by injunction to remove these and all similar obstructions.

In this aspect of the case, it is wholly immaterial who owns the fee in this public landing: whether it be the plaintiff or the defendants. Whoever may be the owner of the fee, the ground itself is subject to the easement of a public landing on a navigable stream, and also that of a public street or highway. Any obstruction to the free use of such public landing and street, by whomsoever erected, is a public nuisance, and any individual specially damnified thereby may have the aid of a Court of Equity to abate the same.

The defendants' claim, therefore, to the ownership, whether equitable or legal, of the ground upon which they have entered and erected the obstructions complained of, will avail them nothing as a defence to the relief sought by the plaintiff.

III.—But the defendants are not the owners, nor in any wise entitled in the lands upon which they have entered.

The patent to Roberts, under whom the plaintiff claims, conveyed all the land bounded on the north by the east and west sectional line, and on the west by the north and south sectional line, and on the only other remaining side, by the water course,—that is, the Mississippi River.

In the U. S. Government Surveys the boundaries are the north

and south, and east and west lines of the Sections and Townships, and in the case of fractions, also the natural or exterior object which causes the fraction—as a water course, Indian Territory, &c. The monuments are the section posts and quarter section posts.

The "meander lines" are not boundaries. They are not even known to the laws or acts of Congress. The term "meander" is simply used to designate certain lines run by the Surveyors along the windings of water courses bounding fractions, for the purpose of ascertaining and returning the quantity of land in such fractions.

The acts of Congress explicitly define "monuments," and provide where they shall be placed.

They are to be set down at the township, section and quarter section corners.

And these acts provide that from these monuments all lines shall be run, north or south, and east or west, until other like monuments or their places shall be reached, or until some water course or other exterior object intervenes.

There is no provision whatever for meandering a water course, or running any line along its bank, or the thread of its stream. But the quantity of land in a fraction must be returned; hence the Surveyor runs lines along the bank of the water course, to determine the quantity of land in the fraction. *Brightly's Dig., p.* 466, *Sec.* 41; *Id. page* 493, *Sec.* 208; *Lester's Land Laws, page* 709.

If the Surveyor make an error in his return as to the quantity of the land, or if the quantity is erroneously stated in the Patent, this will not affect the grant. The grantee will take according to the boundaries of the land described. *Lindsly vs. Hawes,* 2 *Black.,* 554.

The survey, including the maps, plats, field notes and certificates returned into the Land Office, and pursuant to which the grant is made by the Patent, is a matter of record and of equal dignity with and a part of the Patent. *See case last above cited; also*

*Bouv. Dict., Vol. 2, page 566, term "survey"; and authorities there cited.*

The government is concluded by the survey according to which the grant is made. Any subsequent survey of the land by the government made after the grant, is void and without effect as to the grantee. *Lindsly vs. Hawes,* 2 *Black.,* 554; *Bates vs. Ill. Central R. R. Co.,* 1 *Black.,* 204.

So any survey not made in pursuance of the acts of Congress is void. *Lessee of Brown vs. Clements,* 3 *Howard,* 650.

It is clear, therefore, that Roberts under his Patent took all the land lying between the sectional lines and the Mississippi River; that his Patent "calls" for the Mississippi River as one of the boundaries of his grant.

It is beyond question that a call for a river or water course as a boundary, is a call for the thread of the stream or centre of the channel; and hence that such Riparian Proprietor owns to the thread of the stream, subject however to the easement of navigation by the public, when the river or water course is navigable.

Boundaries designated as "up" or "down" the river, or "along" the river, or "by" the river, mean the thread of the river or the centre of the channel. Boundaries running to the river or to the bank of the river run to the thread or centre of the channel of the river.

A river, or water course, when used as a boundary, is used as an entirety. *Angell on Water Courses, Chaps.* 1 *and* 13; *Middleton vs. Pritchard,* 2 *Scammon,* 510; *Ex parte Jennings,* 6 *Cowen,* 518 *and note p.* 536; *Gavit vs. Chambers,* 3 *Ohio,* 496; *Newson vs. Pryor's Lessee,* 7 *Wheat.,* 7; *Jones vs. Soulard,* 24 *Howard,* 63; *Bates vs. Ill. Central R. R. Co.,* 1 *Black.,* 204; 3 *Kent, p.* 427, *Lecture* 52, *Subdivision* 2, (2) *"Riparian Rights."*

IV.—No fact appears showing that the defendants are in any wise entitled in the *locus in quo.*

It does not appear that the conditions of the grant have been complied with; especially those contained in *Sec.* 4 *of the act of Congress of the* 3d *of March,* 1857, 11 *Stat. at large, page* 196.

It does appear, however, from the statutes of this State, and the pleadings, that the defendants have no capacity to take the land in question, nor to become in any wise entitled in the *locus in quo.* The defendants claim their corporate existence and their consequent right to proceed under the land grant of Congress, by virtue of an act of Legislature, approved 10th of March, 1862. *Session Laws,* 1862, *page* 247.

It was not competent for the Legislature at that time to establish a corporation by special act; and hence this act was unconstitutional and void.  *Constitution of Minnesota, Art.* 10, *Sec.* 2.

*By the Court*—WILSON, C. J.—The laws governing the surveys and descriptions of the public lands, to which it is necessary to refer in this case, are found in an act approved May 18, 1796, entitled "An act providing for the sale of the lands of the United States in the Territory north-west of the Ohio River, and above the mouth of the Kentucky River," in an act approved May 10, 1800, amendatory of the aforesaid act, and in an act approved February 11, 1805, entitled "An act concerning the mode of surveying the public lands of the United States."  By these acts it is provided that the public lands shall be subdivided into townships of six miles square, sections of one mile square, and quarter sections, and that these subdivisions shall be bounded by north and south and east and west lines, unless where this is rendered impracticable by meeting a navigable water course, Indian boundary line, or the line of a tract of land before surveyed or patented.  It is also provided that the rule of bounding by north and south and east and west lines, shall be departed from no farther than such particular circumstances require.  By section 2 of the act of 1805, above referred to, it is provided "that the boundaries and contents of the several sections and quarter sections of the public lands of the United States, shall be ascertained in conformity with the following principles:  *  *  *  *  The boundary lines actually run and marked in the surveys returned, shall be established as the proper boundary lines of the sections or subdivisions for which they were intended, and the length of such lines as

returned shall be held and considered as the true length thereof; and the boundary lines which shall not have been actually run and marked as aforesaid, shall be ascertained by running straight lines from the established corners, to the opposite corresponding corners; but in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the said boundary lines shall be ascertained by running from the established corners due north and south or east and west lines, as the case may be, to the water course, Indian boundary line, or other external boundary of such fractional township." The fractional townships are to be surveyed and sold with the adjoining townships, and·it is to be observed that in the survey of such fractional subdivisions, the lines must run to the water course, (when the township is made fractional by a water course,) and such water course is by the act designated as the *external boundary* of the fractional township. No law that we are aware of in terms requires the "meandering" of water courses, but the acts of Congress above referred to, require the contents of each subdivision to be returned to, and a plat of the land surveyed to be made by the Surveyor General. This makes necessary an accurate survey of the meanderings of the water course—that is the boundary of a fractional subdivision—and the line showing the place of the water course and its sinuosities, courses and distances is termed the meander line. The field books, therefore, necessarily show the water course to be the boundary of the tract or subdivision, and· the plat should, and in this case does, correspond with the field books. In this case the correctness of neither could in this respect be questioned. *Bates vs. Ill. Cent. R. R. Co.*, 1 *Black.*, 204.

In March, 1849, the United States conveyed to Roberts lot one in question. At and prior to that time the government plat kept in the local land office, which showed the boundaries and descriptions of the public lands, and in accordance with which sales were made, showed no islands in the river in section five, or opposite lot one. The river at this point is navigable in fact, but being above the flow of the tide it is not deemed navigable in law. One question in the case is, whether the grant by the government to

Roberts of lot one conveyed to him the island, so called, now claimed by the defendants.

The Referee found as a matter of fact, that at the time when the government survey of lot one, in section five, was made, "The meander line of said lot was run along the left or northerly bank of a small channel or slough between said bank and the parcel of land which is designated 'Island No. 11.' That in very low water in the river there was no current and very little water, and that in pools in said channel or slough; and that at a medium stage of water the land designated 'Island No. 11' was above water, and there was a current or flow of water through said channel or slough, and that in very high water in the river the said land designated 'Island No. 11' was inundated."

The defendants' counsel claim that the meander line, and not the river, is the boundary of said lot one. This view is not sustained by the entries in the field books, by the government plat, or by the law in accordance with which the survey and sale were made. The entries in the field books show that the line that bounds lot one on the north, runs east until it intersects the left bank of the river, at which point a post is set called a "meander corner,"—that the line bounding said lot on the west runs south until it intersects the left bank of the river, at which point also, a meander post is set. The meander line of the river between these points commences at the first above mentioned meander post, and runs "*thence up stream*" (the courses and distances being given) to the last mentioned meander post. There is no such thing as a meander line in such case distinct and separate from the line of the river. It is merely an accurate survey of the river, and neither party in this case could be permitted to show that the river is in a different place from that designated by the field book and plat. *See Bates vs. Ill. Cent. R. R. Co.,* above cited. The plat shows the river as the boundary, and the law as we have above seen, requires the boundary lines of such lot on the other two sides to run to the river, and designates the river as the boundary of the third side.

We think, therefore, that it is too clear to admit of a reasonable

vol. x.—14

doubt that the river bounds this lot on one side. But this being admitted, the further question is presented, whether the riparian owner takes to high water or low water mark, or to the middle thread of the stream.

At common law grants of land bounded on rivers above tide water carry the exclusive right and title of the grantee to the middle thread of the stream, unless an intention on the part of the grantor to stop at the edge or margin is in some manner clearly indicated; except that rivers navigable in fact are public highways, and the riparian proprietor holds subject to the public easement. In this case no intention is in any way indicated to limit the grant to the water's edge, and if the common law rule prevails here, Roberts, by his purchase, took to the centre of the river, including the land subsequently surveyed by the government—called Island No. 11—and which is now claimed by the defendants. The common law of England, so far as it is applicable to our situation and governments, is the law of this country in all cases in which it has not been altered or rejected by statute, or varied by local usage under the sanction of judicial decisions. 2 *Kent's Com.*, 27–8. We think, in respect to the rights of riparian owners, it is as applicable to the circumstances of the people in this country as in England. It is not true in fact, as has been alleged, that the navigability in fact of a river above the flowing of the tide is a state of things unknown to or unprovided for by it. *See Hale, Treatise De Jure Maris, &c., part* 1, *Chap.* 3. In its application to cases like the one under consideration it has not been varied or rejected in this State, and the few States of the Union that have repudiated it are exceptions to the general rule. *See Jones vs. Soulard,* 24 *How. U. S. R.,* 41, *and case cited in brief of counsel of defendant in error ; Govett vs. Chambers,* 3 *Ohio,* 496; *Middleton vs. Prichard,* 3 *Scammon's,* 510 ; *Ex parte Jennings,* 6 *Cowan,* 518, *and note ; Palmer vs. Mulligan,* 3· *Caine's Reps.,* 318, *and note ;* 3 *Kent's Com.,* 427, *et seq. and cases cited in note ;* 2 *Smith's Leading Cases,* 217–227; *Angell on Water Courses, chap.* 1, *and cases cited ;* 2 *Washburne's Real Prop.,* 632, *and notes.*

Some—we believe most—of the authorities that deny that the riparian proprietor owns to the middle thread of the stream, hold that he takes to the *low water* mark.    *See Halsey vs. Mc Cormick,* 13 *N. Y. R.,* 296; *Morgan vs. Ready,* 2 *Smeade's & M.,* 366; *Childs vs. Starr,* 4 *Hill,* 396; *Blanchard vs. Porter,* 11 *Ohio,* 138; 2 *Smith's Leading Cases,* 224–6, *and cases cited.*

This we think would include the land claimed by the defendant, and designated "Island No. 11."    We hold, therefore, that by the patent to Roberts, the U. S. conveyed to him said "island."

We think no reason can be given why the same rule should not apply to grants made by the Government that are applicable to grants made by individuals.    Section 9, of the act of Congress, first above cited, provides that all navigable rivers within the territory to be disposed of by virtue of that act, shall be deemed "to be and remain public highways."    At common law rivers navigable in fact are public highways, and the riparian owner holds subject to the public easement.    This act of Congress, therefore, is merely a declaration or affirmance of the common law, and not a modification of it.

The fact that these rivers are, and must remain public highways, is not at all inconsistent with the view, that riparian owners have the fee of the bed of the stream.    *Peck vs. Smith,* 1 *Conn.,* 133.

The defendants' counsel argues that even if Roberts by his purchase from the government became the owner, he afterwards by the record of his plat, parted with the fee of that portion laid out into streets and landing, and that by sec. 7 of chap. 1 of the laws of the extra session of 1857, the legislature authorized the use of said streets by the Railroad Company.    The statute of Wisconsin under which the plat of this portion of St. Paul was recorded, reads as follows:    "When the plat or maps shall have been made out and certified, acknowledged and recorded as required by this act, every donation or grant to the public or any individual, religious society, or any corporation or body politic, marked or noted as such on said plat or map, shall be deemed in law and in equity a sufficient conveyance to vest the fee simple of all such parcels as therein expressed, and shall be considered to all intents and pur-

poses, a general warranty against such donors, their heirs and representatives to the said donee or grantee for his use, for the uses and purposes therein named, expressed and intended, and for no other use and purpose whatever; and the land intended to be for the streets, alleys, ways, commons or other public uses in any town or city, or addition thereto, shall be held in the corporate name thereof in trust to and for the uses and purposes set forth and expressed or intended."

A dedication is not a grant or donation. Its effect is not to deprive a party of title to his land, but to estop him, while the dedication continues in force, from asserting a right of possession inconsistent with the uses and purposes for which it was made. *Hunter vs. Trustees of Sandy Hill,* 6 *Hill,* 407, *Cincinnati vs. Lessee of White,* 6 *Pet.,* 432–438.

If, therefore, the corporate authorities of the town of St. Paul acquired the fee simple of the land over which the streets are laid, it must have been by virtue of the statutory provisions above cited. But we think an examination of the statute will not lead to the conclusion that it operated as a conveyance of the complete title.

The first clause of the section refers to *"donations or grants marked or noted as such in the plat,"* and we think has no reference to the land to be used for streets, landing, &c. As to the lands marked on the plat as granted or donated, the statute declares that this shall be deemed in law and in equity, a sufficient conveyance to vest the fee simple; but as to the lands intended for streets and alleys, the language is not that a fee simple shall pass, but that it "shall be held in the corporate name in trust to and for the uses and purposes expressed or intended."

The change of phraseology is quite significant. In the latter case we think it is manifest that the intention of the statute was not to pass the fee simple, but merely such an estate or interest as the purposes of the trust required. The use for which the dedication was made, therefore, determines the extent of the right parted with by the owner and acquired by the public or corporate authorities of the town. Neither the use for which the dedication was made, nor the language of the statute justifies, in this case, the

conclusion that a legislative transfer of the fee was intended, and without such transfer, it remains in Roberts and his grantees. *See* 2 *Smith Leading Cases*, 215.

The plaintiff, therefore, as grantee of Roberts had an interest and property in the streets and landing opposite lots 11 and 12 which could not, without compensation, be taken for public use or subjected to any greater burden or servitude than was expressed or intended by the dedication under said statute.   The use of the streets and landing by the Railroad Company for a railroad track is, manifestly, not such a use as the  dedication or statute contemplated  or authorized, and we think, it admits of much doubt whether the legislature intended to give the defendants such a license.

The authorization by the legislature of such use would be an interference with the reserved rights of the plaintiff, and an attempt to authorize the taking of private property for public uses without compensation.   *See Redfield on Railways*, 2d *Ed.*, 158–165, *Sec.* 14, *and notes and cases cited in notes ; Williams vs. N. Y. Cent. R. R. Co.*, 16 *N. Y.*, 97 ; *Tate vs. Ohio & Miss. R. R.*, 7 *Port.* (2d,) 499 ; *Haynes vs. Thomas, Id.*, 38.

But even if it was held that by the record of the plat, the corporate authorities of the town of St. Paul acquired a complete title to the land over which the streets and landing are laid, it cannot be doubted but that the transfer was made to them on the consideration and express  condition that the land should be used for and *as streets and landing only*, for the use and benefit of the public generally, and particularly for the use and benefit of the owners of adjacent lots.

If, by this act of the Legislature the town authorities acquired the streets and  landing for the public use, by the  same act they were bound  to dedicate and hold them solely to and for the uses expressed.

The original donor gave the property, and every subsequent purchaser of the lots fronting on the streets or landing purchased on the condition and with the understanding and implied agree-

ment, that the streets and landing should forever be kept open for his use, benefit and enjoyment.

This gave to the adjacent lots their principal value. It would therefore seem that the original owner and subsequent purchasers obtained a property and vested right in the streets and landing. *See Tate vs. Ohio and Mississippi Railroad, and Haynes vs. Thomas, cited above.* If this is so, then the plainest dictates of justice, as well as the express provisions of·our Constitution, would require that the property should not be taken or injuriously affected without compensation.

The Railroad Company having no legal authority to obstruct the streets or landing, and such obstruction being a special injury to the plaintiff, we think he has a right to the relief prayed for.

We think the conclusions of the Referee in the case are correct, and that the judgment below should be affirmed.

BERRY, J.—I agree with the following conclusions arrived at in the foregoing opinion :

1. That lot number one extended to the water's edge at low water mark, including the parcel of land designated as Island No. Eleven.

2. That the landing extended to the same line.

3. That Schurmeier by his purchase of lots eleven and twelve as platted, acquired at least an easement in the landing which could not be impaired for public use without compensation.

4. That the corporate authorities of St. Paul acquired by the plat and the recording thereof, not the fee of the landing, but only such estate or interest as was necessary to support the uses and trusts for which they held it.

5. That the railroad structures, &c., complained of, are an obstruction to the free use and enjoyment of the easement aforesaid, and constitute a private nuisance as respects Schurmeier, entitling him to an injunction.

As to the other conclusions arrived at I express no opinion, but concur in the disposition made of the case.