## HART v. BUCKNER et al.

### (Circuit Court of Appeals, Fifth Circuit. December 19, 1892.)

### No. 90.

**1.** CIRCUIT COURT OF APPEALS — APPEAL FROM INTERLOCUTORY INJUNCTIONAL DECREE—REVIEW.

On an appeal to the circuit court of appeals from an interlocutory order granting an injunction, the right of the complainant to other relief demanded by his bill cannot be considered when the same has not yet been passed upon by the court below; and the only question before the appellate court is the propriety of the injunction.

**2.** MUNICIPAL CORPORATIONS — STREET RAILWAYS — RIGHTS OF LOT OWNERS—INJUNCTION.

The rights of owners of lots abutting on a public street, even though they do not include the fee of the street, are property rights, the invasion of which without authority by an electric railway may be prevented by injunction.

**3.** SAME—PARTIES.

Where there is an unauthorized obstruction of a public street, all of the adjacent lot owners who sustain a special injury therefrom can maintain a suit for injunction, and no other parties defendant are required than the alleged trespasser.

**4.** ELECTRIC STREET RAILWAYS—SALE OF FRANCHISE—POWERS OF COUNCIL.

Laws La. 1888, Act No. 135, requiring that a sale of a street-railway franchise shall be made to "the highest bidder," means the highest bidder in money, and the sale of the franchise is invalid where the specifications call for, and the adjudication is made to the highest bidder in "square yards of gravel pavement." 52 Fed. Rep. 835, affirmed.

**5.** SAME—INJUNCTION—LACHES.

The interval between the sale of the franchise and filing of complainants' bill to enjoin the construction of the railway in front of their premises was one month and eight days, and the franchise itself was granted against the public protest of one of the complainants and of several other residents on the street. *Held,* that there was not such delay as amounted to an acquiescence in the grant, such as would preclude complainants from asserting their rights. 52 Fed. Rep. 835, affirmed.

Appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

In Equity. Bill by Newton Buckner and others against Judah Hart to enjoin the construction of an electric trolley railway in front of complainants' premises on Coliseum street, New Orleans. The

circuit court granted a motion for an injunction pendente lite, (52 Fed. Rep. 835,) and defendant appeals. Affirmed.

Statement by PARDEE, Circuit Judge:

By ordinance 5784, C. S., adopted November 17, 1891, the common council of the city of New Orleans ordained "that the comptroller give notice in a newspaper that he will, at public auction, in the council chamber, on the ——— day of ———, 1891, at the hour of twelve o'clock meridian, (or lower side of Audubon Park;) sell to the highest bidder the right of way for twenty-five (25) years, for street railway purposes, over the following streets, to wit: Commencing within 120 feet of the Canal street ferry landing; thence on the north side of Canal street, over the trunk line of the Canal and Claiborne Street-Railroad Company, to Carondelet street; along Carondelet street, over the track of the Crescent City Railroad Company, to Clio street; along Clio street to Constance street; along Constance street to Louisiana avenue; Louisiana avenue (north side) to Camp street; Camp street to Exposition boulevard, (or lower side of Audubon Park;) and returning along Camp street to Henry Clay avenue street, Henry Clay avenue street to Coliseum street, Coliseum street to Louisiana avenue street, (south side,) Louisiana avenue street to Laurel street, Laurel street to St. Mary street, St. Mary street to Constance street, double track on Constance street to Calliope street, Calliope street to St. Charles street; thence down St. Charles street, over the track of the Crescent City Railroad Company, to Canal street; and thence along Canal street, using the trunk line of the Canal and Claiborne Railroad Company, to the starting point at Canal street ferry landing. * * * All in accordance with map of said route and specifications in the office of the city engineer." In obedience to this ordinance, the comptroller published for three months, according to law, the following advertisement: "Public notice is hereby given that on Monday, March 28th, 1892, in the council chamber, at the city hall, at the hour of 12 o'clock M., will be sold at public auction to the highest responsible bidder the right of way for twenty-five (25) years, for street-railway purposes, over the following streets, to wit, [giving the description above mentioned;] * * * all in conformity with map of said route and specifications in the office of the city engineer, and ordinance No. 5784, C. S., adopted November 17th, 1891." After providing the method in which the road is to be constructed, the character of the rail and the ties, the character of the paving to be done in the streets through which the road ran, and the obligations to be assumed with reference to the paving, repair, and maintenance of the streets, the specifications, approved by city council, provided: "This line may be operated by any motive power now successfully applied in the United States, except steam. The speed shall not exceed twelve miles per hour, unless by ordinance of the council. Cars shall not stop except at the further side of crossings. * * * To enable bidders to estimate the cost of the paving, the city holds offers to deliver gravel to the purchaser of the franchise at a fixed rate and a fixed time. These offers can be seen at the office of the city engineer. Work of construction shall begin within two weeks after the date of the signing of the contract, and so completed as to be in operation within one year after the same date. A bond of $50,000, approved by the mayor, shall be given to insure the commencement and completion of the work, and in a satisfactory manner, within the dates specified. The party or parties to whom the right of way is sold shall engage and contract with the city of New Orleans to construct a certain number of square yards of gravel pavement, according to the general specifications for such paving, and, together with accompanying Belgian blocks, bunting, curbs, counter curbs, and gutter bottoms, which shall be estimated for and computed in the number of square yards, and not to be charged for as an extra, or in addition to said square yards of paving, which shall be constructed on such streets and commencing at such points as the city council may hereafter designate." And by supplementary specifications, showing neither approval by city council nor date, it was provided: "The sale of this franchise, under the right of the city to reject any or all bids, shall be adjudicated to the party or parties who offer to build the greatest number of square yards of gravel pavement, including, without extra cost, paving, curb

planking, curbs, gutter bottoms, counter curbs, wings, Belgian block crossings, and bunting along the tracks and culverts, provided that such bid is not less than 60,000 square yards    The terms upon which the work of paving, etc., can be done are on file in the office of the city engineer."

At the date and place appointed in the advertisement Judah Hart appeared and bid the minimum fixed in the specifications; that is, 60,000 square yards of gravel pavement. This bid was duly reported to the council by the comptroller, and the council thereupon passed ordinance No. 6260, C. S., adopted April 12, 1892, directing the mayor to enter into a notarial contract with Judah Hart for the right of way for 25 years, for street-railway purposes, over the route designated in the advertisement, all in conformity with the map or said route and specifications in the office of the city engineer, and ordinance 5784, C. S., adopted November 17, 1891, and as per his bid of March 28, 1892. The parties thereupon went before the city notary on the 8th day of June, passed the notarial contract provided for by ordinance 6260, and gave a bond for $50,000, required by the ordinance. On June 28, 1892, a large number of property holders on Constance street, between Felicity and Calliope streets, petitioned the council not to permit the laying of a double track on that street, as it was a very narrow street, and asking the council to order the removal of one of the tracks provided for in the franchise sold to Judah Hart to some other street. This petition was referred to the streets and landings committee, who referred the matter to a subcommittee. This subcommittee reported that the objection of the property holders on Constance street was well founded, and advised that one of the tracks be changed to Coliseum street from Louisiana avenue to Race street, and on Race street to Camp street, and on Camp street over existing tracks. The report of the subcommittee was taken up by the whole committee, and approved, and this committee thereupon reported an ordinance to the council, modifying the right of way of the franchise granted to Hart. This ordinance was adopted, and became ordinance No. 6595, C. S.    It provides that "whereas, the route of the street railroad franchise adjudicated to Judah Hart under the provisions of ordinance No. 5784, C. S., provides for a double track on Constance street, from St. Mary street to Calliope street; and whereas, Constance street, between the points designated, is too narrow for the construction and operation of a double track, regard being had to the interests of the residents on said street; and whereas, it is to the interest of the city that the route of said railroad should be modified so as to take said double track off of Constance street, and to make one of said tracks run on Coliseum street from Louisiana avenue to Race street, and thence to Camp street; and whereas, the said Judah Hart is willing to accept the modification of said route as herein proposed: "Section 1. Be it ordained by the common council of the city of New Orleans, that the route of said railroad adjudicated to Judah Hart under the provisions of said ordinance No. 5784, C. S., be changed, amended so as to read as follows, to wit: * * *," giving the changed route, taking one of the tracks off of Constance street, and the removal of that track from Constance street and Laurel street to Coliseum street, from Louisiana avenue to Race street, through Race street to Camp street, and down a portion of Camp street over the tracks of the Crescent City Railroad. The whole body of the franchise above Louisiana avenue and below Race street remained entirely unchanged.

The second section of the ordinance provided that Judah Hart should signify his acceptance of this order by a notarial contract, signed by himself and the mayor before the city notary, and authorizing the mayor to enter into such contract with Hart, changing the route of the railroad. This ordinance was adopted on the 2d of August, 1892. While this ordinance was pending, to wit, on July 15th, certain property holders on Coliseum street, between Louisiana avenue and Race street, presented to the council a petition, protesting against the granting of the right of way to lay a railroad on that part of Coliseum street; the ground of their protest being that petitioners had at a heavy expense recently graveled the street; that it is the only street running through that part of the city, and the only one of the smaller streets left, not now defaced with railroad tracks; and averring that a great hardship would thereby be worked to the petitioners to have the said street, which they had recently been put to the expense of constructing, ruined, and that it

would be a great inconvenience to the general community which now uses the said street as a pleasure drive. In accordance with the provisions of the ordinance, the mayor and Judah Hart appeared before the city notary on the 9th day of September, and executed a notarial contract, embodying the terms of the ordinance.

Work was immediately commenced by Hart under these ordinances, and, as shown by the affidavit of M. J. Hart and the affidavit of G. A. Hopkins, prior to the 15th day of October, 1892, Hart had entered into contracts for the construction and equipment of the said property, amounting to the sum of $363,050. Large amounts of materials provided for in said contracts had prior to that date been delivered by the contractors. Ten thousand dollars worth of gravel had been delivered and put in position. Eight thousand seven hundred feet of Camp street, from Louisiana avenue to Joseph street, had been graded, and cross-ties and track material delivered for the roadbed. Coliseum street had been graded for a single track from Louisiana avenue to Napoleon avenue, a distance of three thousand six hundred feet, and cross-ties and track material were delivered for the roadbed. Twelve thousand cross-ties had been delivered at the Carrollton avenue switch from the belt line to be put in the construction of the railroad, and track material for about seven miles of track had been put in position. Thousands of dollars had been spent in the excavation of the streets covered by the franchise, and nearly all the material for the overhead work and construction had been delivered by the contractors and put in place along the route of the railroad.

On the 17th of October, 1892, Newton Buckner and six other persons, claiming to be property holders on Coliseum street between Louisiana avenue and Race street, being that part of Coliseum street covered by the modification of the route provided for under ordinance No. 6595, C. S., filed a petition in the civil district court for the parish of Orleans, averring that they were owners of real estate on the designated portion of Coliseum street; that they had lately contributed large sums of money for the purpose of paving said Coliseum street with Rosetta gravel; that by reason of the paving, as well as by the fact that adjoining parallel streets are occupied by street-railroad tracks, said Coliseum street had become a thoroughfare much resorted to by the citizens of New Orleans as a pleasure drive, and that by reason of said paving the value of their property had been enhanced; that the city council had adopted ordinance No. 5784, directing the advertisement and sale of the street-railroad franchise therein mentioned; that the comptroller had advertised the said franchise for sale, but did not, as required by section 4 of act 135 of the Acts of Louisiana of 1888, publish the specifications of the franchise; that the comptroller did not, at the expiration of the delay, as required by ordinance No. 5784, and by the act of 1888, sell to the highest responsible bidder the franchise; but, instead of selling the same, pretended to accept, as the consideration of the franchise, an offer of Judah Hart to furnish the city of New Orleans not less than 60,000 square yards of gravel paving; that by virtue of ordinance No. 6260 the mayor and Judah Hart had entered into a pretended contract with reference to the said franchise; that, as said specifications had not been published as provided by law, and as the aforesaid franchise had not been sold at public auction to the highest bidder under the requirements and limitations of ordinance No. 5784, C. S., and Act 135 of 1888, the said offer of said Hart to acquire said franchise, and the said ordinances Nos. 5784, C. S., and 6260, C. S., and the pretended contract of the 8th of June, 1892, were absolute nullities, and devoid of all legal effect, and did not and could not convey to him the franchise. They further aver the passage of ordinance No. 6595, C. S., modifying the route as originally adjudicated, and that the franchise or right of way over the part of Coliseum street granted by the modification greatly exceeds in value the rights of way over those streets for which it was thus permitted to be substituted; but that in spite of this fact said change was by said common council ordained without consideration of the city of New Orleans, without publication, and without adjudication of said franchise, as required by Act No. 135 of 1888; that petitioners vainly protested to the common council against the change; that they are informed and verily believe that said Judah Hart, under this ordinance, intends to enter upon Coliseum street, between Louisiana avenue and

Race street, for the purpose of laying a roadbed and tracks for a street railway, the same to be operated by using as motor power the so-called "trolley system of electricity," and that, if permitted to do so, he will utterly ruin the paving of Coliseum street, thereby inflicting upon petitioners irreparable injury, besides depreciating the value of their property more than $10,000; that the trolley system of electricity is an unmitigated nuisance, "pre-eminently dangerous to life, and destructive to peace and comfort," and that its adoption for a narrow street like Coliseum street, which has a width of about 25 feet, would prevent absolutely the safe use of said street by other vehicles, and would render the approach in carriages to petitioners' houses unsafe, if not impossible, and would destroy the quiet enjoyment of their homes. They pray for citation of Hart, and for judgment decreeing—First, that the alleged adjudication to Hart under ordinances Nos. 5784, 6260, and 6595, C. S., and the contracts of date the 8th of June and the 9th of September, 1892, to be illegal, null, void, and of no effect; second, perpetually enjoining Hart from entering upon Coliseum street between Louisiana avenue and Race street, for the purpose of constructing a street railway, under and by virtue of said ordinance and the said pretended contracts, and from disturbing the surface or paving of said Coliseum street between Louisiana avenue and Race street, or making any excavations or constructions therein or thereon in furtherance of the purpose of said ordinance and contract; and, third, praying for a preliminary injunction, in the event of such disturbance, during the pendency of this suit. Hart, being a citizen of New York, appeared, and removed this cause into the circuit court of the United States for the eastern district of Louisiana.

When the record was filed in the circuit court the complainants appeared and filed an amended and supplemental bill, setting forth the bringing and removal of the suit, and reaverring all the matters contained in their petition; and further averring that, as front proprietors of property on Coliseum street, between Louisiana avenue and Race street, the railroad proposed to be constructed by defendant and operated by the trolley system of electric cars, by reason of its impairing the pavement on said street and obstructing the highway and the approach to their residences, and by its noise and danger, will be a nuisance specially affecting and injuring irreparably them, and each of them, in their comfort and convenience and rights of property; further averring that under the charter of the city of New Orleans the council had no power to grant authority to said Hart to construct and operate a road by means of the trolley system of electricity. They further show that Hart had entered upon a portion of the street since the filing of the suit in the civil district court, and they pray for a preliminary injunction to restrain him. Notice was given, the matter was heard, the circuit court granted the injunction, and Hart, under section 7 of the act, approved March 3, 1891, has appealed to this court.

On the hearing of the injunction the complainants offered no affidavits in support of the allegations of their petition and amended bill, except the affidavit of one of the complainants, Newton Buckner, as to the truth of the averments of the petition and bill themselves. The defendant offered the affidavit of the city engineer and that of M. J. Hart, together with maps of Coliseum street and Constance street, to show that Coliseum street between Race street and Louisiana avenue was 25 feet wide from outer curb to outer curb, and that there was a space of 9 feet and 2 lines on each side of the railroad track between the center of the rail and the outer curb, leaving ample space on each side of the track for the use of the general public and the passage and standing of vehicles; and showing that the double track on Constance street would leave only 4 feet and 2 lines between the trend of the rail and the exterior curb,—a space entirely too narrow to permit the standing or passage of a vehicle. The affidavit of Brown, city engineer, M. J. Hart, and G. A. Hopkins, engineer, together with the profiles of Coliseum street, and the specifications for the construction of the railroad on that street, tend to show that the taking up of the gravel pavement, the laying of Belgian block between the tracks, and a bunting of the same on each side of the rail, and the renewal of the gravel on the street in accordance with the specifications, will make the street better, more substantial, and more durable

for public use than before. The affidavits of R. T. Macdonald and E. J. Hathorne show that the trolley system is not a nuisance, and that it is not dangerous to life or property.

The following are the assignments of error on appeal: "(1) That the court erred in holding that the city council had no right or power to change the route of said road from Constance and Laurel to Coliseum street, from Louisiana avenue to Race street, without three months' advertisement and adjudication; (2) that the court erred in holding that the adjudication of the whole franchise at a price to be paid in gravel pavement was void; (3) that the court erred in holding that the complainants had any right or authority, under the allegations of their bill, and in the absence of the city of New Orleans as a party in the record, to raise the questions covered by assignment in error No. 2; (4) that the court erred in holding that the complainants were not estopped, under the facts set forth in the affidavits, from raising any objection to the construction by the defendant of the railway in question under his grants from the city of New Orleans."

Edgar H. Farrar, (B. F. Jonas and Ernest B. Kruttschnitt, on the brief,) for appellant.

Harry H. Hall and W. Wirt Howe, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

PARDEE, Circuit Judge, (after stating the facts.) The order appealed from enjoins the defendant from entering upon Coliseum street, between Louisiana avenue and Race street, for the purpose of constructing a street railway, and from disturbing the surface or the paving of said Coliseum street, or from making excavations or constructions therein or thereon, by virtue of certain city ordinances and contracts recited. The propriety of this order is all that is before us for review. Whether the appellees, complainants in the court below, are entitled to all the relief prayed for in their original and supplemental bills must first be determined in the court below, before this court can review on appeal. The contention of appellees in this court and in the court below, as stated by their counsel in the elaborate brief filed, is as follows:

"This suit is brought by complainants, not as taxpayers complaining of a fraudulent or illegal contract prejudicial to the said complainants in common with all other citizens, but by them as owners of realty whose peaceful enjoyment thereof is illegally threatened. They aver that defendant has no right to enter upon the streets aforesaid, for the purpose of constructing his railroad. He answers that he has, by virtue of the authority granted to him by ordinances 5784 and 6595. Complainants reply that, in so far as said ordinances pretend to authorize the trespass complained of, they are illegal, and they pray to have them so declared by the court. They do not ask that, as between the city and defendant, the so-called 'contract' be annulled; but they say when defendant attempts by virtue of them to invade respondents' rights that they are illegal, and do not justify the invasion. They do not attempt to invalidate any of Mr. Hart's so-called 'rights,' except in so far as they are used by him as pretended authority for laying his tracks on Coliseum street between Louisiana avenue and Race street."

Owners of lots abutting on or adjacent to a public street of a city, even if not owners of a fee in the street, have the right of access and the right of quiet enjoyment, and such rights are property which may be protected by injunction when invaded without legal authority. Dill. Mun. Corp. § 587b; Dudley v. Tilton, 14 La. Ann.

283; Schurmeier v. Railroad Co., 10 Minn. 82, (Gil. 59;) Wetmore v. Story, 22 Barb. 414; Pettibone v. Hamilton, 40 Wis. 402.

Where there is an unauthorized obstruction or closing of a public street, all the adjacent owners who sustain by such obstruction a special injury can maintain a suit for injunction against the party or parties making the obstruction. Dudley v. Tilton, supra; Pettibone v. Hamilton, supra; Griffing v. Gibb, 2 Black, 519. In such a suit no other parties defendant than the alleged trespasser are required. Railroad Co. v. Ward, 2 Black, 485. In the case under present consideration, it seems that all the necessary parties, if not all the proper parties, are before the court.

The asserted right of appellant to invade Coliseum street was only acquired one month and eight days prior to the institution of the suit for injunction. It was granted by the council of the city of New Orleans, against the public protest of one of the complainants to the suit and other residents and property holders on Coliseum street. As we gather from the record, the actual invasion of Coliseum street between Louisiana avenue and Race street took place since the commencement of the suit, and then was apparently for the purpose of raising the question of right. Until the actual or attempted invasion of the street, the property holders thereon were not required to go into the courts to attack a pretended right which, until their street was invaded, in no wise affected them, except in common with all the other property holders and taxpayers of the city. Considering the public protest of the property holders, the short period elapsing between the acquisition of the right and the institution of the suit, and that the complainants were not specially called upon to act until their street was actually invaded, we are of the opinion that there has been no acquiescence, no standing by, nor sleeping upon rights, to any such extent as would equitably estop the plaintiffs from maintaining their legal rights.

The transaction between the city of New Orleans and the appellant by which appellant acquired all the rights that he has to a street-railroad franchise on Coliseum street was one of barter and exchange; i. e. a street-railroad franchise was exchanged for a certain amount of public work and material in the nature of gravel paving to be thereafter constructed on the streets of the city. The specifications as to the street-railroad franchise disposed of were reasonably definite and certain. Those with regard to gravel paving to be furnished were, perhaps, definite enough as to character and composition, but were indefinite as to a very important element of cost,—the street or streets upon which the work was to be done being left to the after-determination of the city council. The expense of building, say 60,000 square yards of gravel pavement in the streets of New Orleans, largely depends upon the location of the streets, the excavations or filling necessary, and the distance from the main line and switches of the Illinois Central Railroad. The nature of the exchange offered by the city was such as to necessarily limit competition, and to a marked degree. No one, however desirous he may have been of acquiring the street-railroad franchise offered by the city council, could safely bid for the same,

unless he was also willing and ready to deal in gravel, and undertake the business of paving streets with gravel; and certainly no contractor engaged in the business of street paving could have bid on the contract to the advantage of the city unless his means permitted him to buy, own, and operate a street-railroad franchise.

Complainants in the court below (the appellees here) contend that the said transaction was and is absolutely null and void, because entered into without authority on the part of the city council, and in contravention of the express limitations imposed upon the city council in the charter of the city and by subsequent acts of legislation. They say (1) that the city of New Orleans has no authority under its charter to authorize a street-railroad to be operated with electric power as a motor; (2) that the use of the overhead "trolley" system is a nuisance; (3) that the street-railroad franchise disposed of to appellant was not advertised according to law; (4) that the franchise, as to Coliseum street, between Louisiana avenue and Race street, was not advertised at all; and (5) that under the act of 1888 the city of New Orleans is prohibited from disposing of a street-railroad franchise otherwise than for cash and to the highest bidder. Any one of these objections, if well taken, sustains the propriety of the order appealed from.

The charter of the city of New Orleans (Act No. 20, Acts La. 1882) expressly declares that the said city—

"Is hereby created, incorporated, and established as a political corporation by the name of the city of New Orleans, with the following powers, and no more."

Section 8 of the said charter (paragraph 13) declares that the city council shall—

"Have the power to authorize the use of the streets for horse and steam railroads, and to regulate the same; to require and compel all lines of railway or tramway in any one street to run on and use the same track and turntable, and compel them to keep conductors on their cars, and compel all such companies to keep and repair the streets, bridges, and crossings through or over which their cars run."

And section 21 provides that—

"All contracts for public works or for materials or supplies ordered by the council shall be offered by the comptroller at public auction, and given to the lowest bidder who can furnish security satisfactory to the council; or the same shall, at the discretion of the council, be advertised for proposals to be delivered to the comptroller in writing, sealed, and to be opened by such comptroller in the presence of the finance committee of the said council, and given to the persons making the lowest proposals therefor, who can furnish security satisfactory to the council: provided, that the council shall in either case have the right to reject any or all of the bids or proposals."

At the same session of the legislature, it was provided—

"That hereafter, whenever the city of New Orleans, through her proper authorities, shall contract with private corporations or individuals for the sale or lease of public privileges or franchises, such as the right of way for street railroads or for other public undertakings within her legal power and control, the price paid for the sale or lease of public privileges or franchises shall be applied by such city in the performance of work of public improvement of a permanent character, such as paving of streets, embellishing parks," etc. Act 81, Acts La. 1882.

By Act 135, (Acts La. 1888,) entitled "An act further defining the powers and duties of the council and officers of the city of New Orleans, and imposing additional limitations thereon," it is provided in the first section—

"That neither the council of the city of New Orleans, nor any committee thereof, nor any of the officers of said city, shall have power to bind the city by any contract for any public work, or for the purchase of any materials or supplies for any of the departments of the city government, unless there shall have been previously passed a resolution authorizing the said contract or the said purchase, and unless the said contract for public work or for the furnishing of said materials and supplies shall have been let by the comptroller to the lowest bidder, as provided in section 21 of said charter: provided, however. that in cases of emergency the officers of the various departments may make bills for supplies of materials not exceeding fifty dollars; but in all such cases immediate report in writing of the making of such bill shall be made by the head of the department to the mayor, setting forth the reason of its action, which report shall be laid by the mayor before the council. and receive the approval of that body before the said bill is ordered paid."

And in the second section—

"That on the first of January and July of each and every year each and every head of every department of the city government shall lay before the council an estimate of the supplies and materials (within the limitation of the appropriations made in the budget for his department) that may be needed in his department during the current six months; and the said council shall approve or modify, in its discretion, said estimate, and shall thereupon direct the comptroller to advertise and adjudicate the contract to furnish said supplies and material, or so much thereof as may be needed, to the lowest bidder, as provided in section 21 of the city charter."

And in the fourth section—

"That said council shall not have power to grant, renew, or to sell or to dispose of any street-railroad franchise, except after at least three months' publication of the term and specifications of said franchise, and after the same has been adjudicated to the highest bidder by the comptroller, as provided in section 21 of the city charter."

The intention of the legislature in enacting the foregoing provisions is apparent. The powers given to the city council under the charter are to be strictly construed. In all purchases of public work, supplies, and material full notice and free competition are required, and the contracts therefor are to be given to the lowest bidder. In any disposition of a street-railroad franchise, either by grant or renewal, a full publicity of exactly the franchise to be disposed of, with free competition, and every adjunct to secure the best price, is required. No room is left, if the statutes are complied with, for secrecy, jobbery, favoritism, or the exercise of political and private influence, conceded by counsel to be the mischief sought to be remedied, particularly by the act of 1888 entitled "An act further defining the powers and duties of the council and officers of the city of New Orleans, and imposing additional limitations thereon."

An examination and comparison of these acts in the light of the conceded legislative intention lead to the further conclusion that in the purchase of public works, supplies, and material, or in the disposition of street-railroad franchises, the contract of sale

is alone permitted to the city council. The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself. Civil Code La. art. 2439. It is only by a sale in public market that the free competition exacted by the statutes can be obtained. In order to purchase at public auction and from the lowest bidder, and to dispose of at public auction to the highest bidder,—almost of necessity, it seems,—the measure of value must be in current money. The act of 1882, quoted above, distinctly infers a price or sum of money to be obtained from the sale or lease of street-railroad franchises, and directs the application thereof. The act of 1888 clearly implies in every section quoted that the city council is to purchase public work and material and dispose of street-railroad franchises for current money. The judge of the circuit court, on this point, says:

"It seems to me that where a bid is invited in corn or wine or any goods, wares, or merchandise it necessarily more or less circumscribes the freedom of the competition, for there is more or less difficulty in obtaining any article, even to those who have the money. It is not enough that the city needs the article; the article itself must also be as easily obtainable as money. The substitution of anything for money itself would naturally give an advantage to those who had that article, and who know how or where and upon what terms it could be purchased, and would make the sale less calculated to absolutely secure the highest price, and thus defeat the object of the statute. Section 4, (Act No. 135 of the Acts of 1888,) above referred to, requires that the sale shall be to the highest bidder by the comptroller, as provided in section 21 of the city charter. That section, which is found on page 25 of the Acts of 1882, requires that the sale shall be offered by the comptroller, at public auction, and given to the lowest bidder. Now, it seems to me clear that, considering the object the legislature had in placing this prohibition upon the common council, requiring the long advertisement of three months, and sale at auction of railroad franchises, they meant that the sale should be for that which would least restrict the number of purchasers, as well as for the amount of the bid, and therefore meant that it should be for money; and that the sale of the entire franchise to the defendant, having been for gravel pavement, and not for money, is invalid." 52 Fed. Rep. 837.

This reasoning is very cogent.

"It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation,—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied. Of every municipal corporation the charter or statute by which it is created is its organic act. Neither the corporation nor its officers can do any act, or make, any contract, or incur any liability, not authorized thereby, or by some legislative act applicable thereto. All acts beyond the scope of the powers granted are void." Dill. Mun. Corp. § 89.

As has been noticed above, the transaction between the city of New Orleans and the appellant, disposing of a street-railroad franchise, was one of barter and exchange, necessarily limiting competition. The authority to make such a transaction is not granted in express words in the charter, nor is it necessarily or fairly implied in or incident to the powers expressly granted; nor is it essential to the declared objects and purposes of the corporation, but.

on the contrary, as has been shown, it is in conflict with the legislative intent as declared in the charter and in the subsequent legislation referred to. At all events, there is a fair, reasonable doubt concerning the power of the city council to enter into the transaction complained of, and the same should be resolved against the corporation, and the power denied. "Whatever is done in contravention of a prohibitory law is void, although the nullity be not formally directed." Rev. Civil Code La. art. 12. The other nullities alleged against the rights of appellees need not be considered. It follows that the order appealed from should be affirmed, and it is so ordered.