UNITED STATES v. ELLIOTT et al.

(Circuit Court, E. D. Missouri. October 24, 1894.)

1. CONSPIRACY IN RESTRAINT OF INTERSTATE COMMERCE—WHAT CONSTITUTES.
   A combination by railroad employés to prevent all the railroads of a large city engaged in carrying the United States mails and in interstate commerce, from carrying freight and passengers, hauling cars, and securing the services of persons other than strikers, and to induce persons to leave the service of such railroads, is within Act July 2, 1890, § 1, which provides that every contract, combination in the form of trust or otherwise, "or conspiracy in restraint of trade or commerce" among the states, is illegal.

2. SAME—INJUNCTION—POWER OF CONGRESS TO AUTHORIZE.
   Act July 2, 1890, § 4, which provides that the circuit courts of the United States have jurisdiction to restrain combinations and conspiracies to obstruct and destroy interstate commerce, before such objects are accomplished, is not void for want of power in congress to authorize such proceedings.

3. SAME—INJUNCTION ORDER—PERSONS NOT NAMED IN BILL.
   Under Act July 2, 1890, § 5, an injunction order in an action to enjoin an illegal conspiracy against interstate commerce may provide that it shall be in force on defendants not named in the bill, but who are within

the terms of the order, where it also provides that it is operative on all persons acting in concert with the designated conspirators, though not named in the writ, after the commission of some act by them in furtherance of the conspiracy, and service of the writ on them.

Bill by the United States against M. J. Elliott and others to restrain a conspiracy to obstruct and destroy interstate commerce in violation of Act July 2, 1890 (26 Stat. 209). A preliminary injunction was granted. 62 Fed. 801. Defendants demurred to the bill. Demurrer overruled.

Wm. H. Clopton, U. S. Atty.

W. W. Erwin, S. S. Gregory, and W. A. Shumaker, for defendants.

PHILIPS, District Judge (orally). This case was submitted yesterday on the demurrer filed to the bill by certain of the defendants. The district attorney submitted the same on the pleadings; and the defendants, on the pleadings and an extensive brief. This suit grew out of the recent "strike," and the bill was filed on behalf of the United States, by the district attorney, under direction of the attorney general of the United States, to enjoin the defendants from the consummation of an organized conspiracy, which threatened to obstruct and was impeding the passage of the United States mails, and interfering with interstate commerce. The demurrer, of course, admits all the material allegations of the bill; that is, all facts which are well pleaded. These averments may be summarized as follows: It is charged, in substance, that the defendants have combined and confederated together to prevent the several railroads named in the bill,—being about all of the many important roads coming into the city of St. Louis, Mo.,—which are engaged in carrying the United States mails and in interstate commerce, carrying passengers and freights, from conducting their customary business in transporting passengers and freights between and among the different states of the Union, and foreign countries. It is further charged that said defendants have combined and conspired to induce persons in the employ of said railroads to leave the service of their respective companies, and to prevent the companies from securing the services of other persons in the place of those induced to quit, the object of such conspiracy being to prevent said railroad companies from hauling cars which are extensively used in the necessary transaction of their business in interstate commerce. The bill charges the commission of divers and sundry acts by the alleged conspirators in furtherance of the objects of the confederation. Among other things, it is alleged that certain of the defendants, under the leadership of one Debs, have issued orders and directions to persons in the employ of of said railroads to act subject to their direction, whereby said employés have been commanded and required to cease from operating the respective railroads. It is further charged that certain of said defendants have threatened to tie up the entire operations of trains of such of said companies as refuse to accede to certain demands made upon them by the leaders of the conspiracy, and that it is the purpose and object of the defendants to so obstruct and crip-

ple the business of said roads as to prevent them from performing their duties and functions as common carriers of freights and passengers among the several states through which the several lines of said roads pass. It is further alleged that it is among the objects and plans of said conspirators to control the interstate commerce between the city of St. Louis and points in other states, and thereby prevent the owners of said roads from exercising any independent control thereof in the transaction of interstate commerce. The bill further sets up, what is quite an historic fact in commercial circles, that the city of St. Louis is a large live-stock market for the sale and slaughter of cattle and hogs, and the preparation of the same for food, and is also a large manufacturing center, from which point these food supplies and manufactured articles are distributed to various points throughout the United States, and other necessaries of life, which have become essential to the commerce, growth, and development of the country, and for its domestic life, and that the aforesaid interference with the transportation of these supplies is a great public detriment, not only to said city, of 600,000 people, but to all the people of the various states reached by the exertions and efforts of this distributing point, who, by the course of business, have become largely dependent upon this source of supply. The object of the bill is to have these parties, and their aiders and abettors, enjoined and restrained from the further prosecution of their unlawful purpose and dangerous conspiracy.

The demurrer raises the question of the jurisdiction of this court over the subject-matter, and the right of the United States to bring such suit in equity; and various other suggestions are made, of minor importance. As recited in the temporary order of injunction made by Judge THAYER, the suit was instituted upon the authority of the attorney general of the United States, and the bill is properly sworn to, in the usual form. I do not propose to go into any extended discussion of the many various questions discussed by counsel in the brief.

It is a fact of supreme importance, to be stated at the very threshold of this discussion, that the regulation and control of commerce among the states of the Union, and with foreign nations, is, by the federal constitution, reposed exclusively in the congress of the United States. The felt necessity of this federal jurisdiction was the one great impelling cause that led to the formation of the federal Union, and the adoption of the federal constitution. As early as 1778 this question was pressed upon the consideration of congress by a memorial from the state of New Jersey, and in 1781 Dr. Witherspoon, one of the statesmen of that day, presented a resolution which declared that "it is indispensably necessary that the United States, in congress assembled, should be vested with a right of superintending the commercial regulations of every state, that none may take place that shall be partial, or contrary to the common interests." And in 1786 Virginia adopted a resolution appointing commissioners to meet with like commissioners from other states, and the resolution to that effect, formulated by Mr. Madison, recited in the preamble that "Whereas, the relative situation of the United States has

been found on trial to require uniformity in their commercial regulations," etc. That great jurist, Chief Justice Marshall, in Brown v. Maryland, 12 Wheat. 445, most aptly presents this matter, as follows:

"The oppressed and degraded state of commerce previous to the adoption of the constitution can scarcely be forgotten. It was regulated by foreign nations with a single view of their own interests, and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties, but the inability of the federal government to enforce them had become so apparent as to render that power, in a great degree, useless. Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the federal government contributed more to that great Revolution which introduced the present system than the deep and general conviction that commerce ought to be regulated by congress. It is not, therefore, matter of surprise that the grant should be as extensive as the mischief, and should comprehend all foreign commerce and all commerce among the states. To construe the power so as to impair its efficacy would tend to defeat an object in the attainment of which the American public took, and justly took, that strong interest which arose from a full conviction of its necessity." "What, then, is the just extent of a power to regulate commerce with foreign nations, and among the several states?" "The power is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a state, but must enter its interior." "Commerce is intercourse. One of its most ordinary ingredients is traffic."

In the passion of the hour, we are apt to forget the pit from which we were dug, and the rock of permanency upon which our feet were planted, by the wise and patriotic men who constructed the fabric of our government. The power to regulate commerce among the states carries with it, as the supreme court has repeatedly held, the power to protect and defend.

On July 2, 1890, congress passed the law entitled "An act to protect trade and commerce against unlawful restraints and monopolies," section 1 of which is as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." It may be conceded that the controlling, objective point, in the mind of congress, in enacting this statute, was to suppress what are known as "trusts" and "monopolies." But, like a great many other enactments, the statute is made so comprehensive and far-reaching in its express terms as to extend to like incidents and acts clearly within the expression and spirit of the law. It declares that every act, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the states, or with foreign nations, is forbidden. Therefore, any combination or confederation among two or more persons, in restraint of trade or commerce, comes within the express letter of the statute. The term "restraint of commerce" was used in its ordinary, business understanding and acceptation. Among the recognized meanings of the word are "prohibition of action; holding or pressing back from action; hindrance; confinement; restriction." It is a restriction or hindrance created by the application of external force. It is a vis major applied directly and effectually to carriers of

interstate commerce, which prevents them from operation. Olivera v. Insurance Co., 3 Wheat. 193. It was perfectly competent for congress, in the exercise of its constitutional jurisdiction of the whole subject of such commerce, to pass laws to prevent and suppress unlawful conspiracies and combinations to interfere with the operation of such commerce. Accordingly, section 4 of said act provides that:

"The several circuit courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the attorney general, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited." "When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

It was pursuant to this statute, inter alia, that Judge THAYER issued the temporary restraining order in this case. I am unable to perceive the force of the argument against the power of congress to authorize such civil proceedings in equity to suppress and restrain combinations and conspiracies to accomplish the obstruction and destruction of interstate commerce and trade before it is accomplished. It was just as competent for congress to provide this civil remedy of prevention as it was to provide for punishment in a criminal proceeding for the unlawful conspiracy entered upon or consummated.

It is urged by counsel for defendants that courts of equity will not interpose by injunction to prevent the commission of an act which, when done, would be a crime penally punishable. This is an "old saw." It is a general rule of equity jurisprudence that courts of chancery will not interpose where there is an adequate remedy at law, nor will they ordinarily interpose to prevent the commission of a crime. A well and long established exception to this rule is that where parties threaten to commit a criminal offense, which, if executed against private property, would destroy it, and occasion irreparable injury to the owner, and especially where such destruction would occasion a multiplicity of suits to redress the wrong if committed, courts of equity may interpose by injunction to restrain the threatened injury. The law, it does seem to me, would be very imperfect, and indeed impotent, if a number of irresponsible men could conspire and confederate together to destroy my property, to demolish or burn down my house, that I should be remitted alone to the criminal statutes for their prosecution after my property was destroyed. Most generally, such lawbreakers who engage in such conspiracies are a lot of professional agitators. They have no property to respond in damages. Their tongues are their principal stock in trade; and inasmuch as imprisonment for debt is abolished, and cruel and unusual punishments are prohibited, an execution would be quite unavailing. It certainly presents a case that most strongly appeals to the strong arm of a court of equity to reach forth to pre-

vent great injury and loss, as the only means of conserving the rights of private property. It is now a well-recognized office of a court of equity to conserve and preserve the rights of private property in advance of its molestation and appropriation, where, from the peculiar circumstances, the remedy at law might be of doubtful restitution. In the recent case in Chicago, in which E. M. Arthur was intervener, against Thomas F. Oakes et al. (63 Fed. 310), Mr. Justice Harlan, in reviewing the restraining order issued by Judge Jenkins, has very effectually met this objection, and presented the law respecting unlawful conspiracies with a force and clearness to forever set this question at rest. It may not be out of place here to say that no public decision has perhaps been so much misunderstood, or ignorantly or intentionally misrepresented and perverted, as that of the distinguished jurist. The opinion recognizes the right of employés and labor organizations, in the absence of a contract binding the employé to a given term of service, whenever they become dissatisfied with their employment or their wages, to quit the service of the employer, either separately or collectively; and they have a right, by preagreement or preconcert of action, to unite together for taking peaceful and lawful means to secure an increase of wages; to withdraw, separately or in a body, from the service of the employer, when dissatisfied. It is not competent for the courts to interpose to restrain their right of volition, which is among the natural and inalienable rights of every citizen, to work for whom he pleases, where he can get employment, and to quit whenever he is dissatisfied therewith. But the opinion distinctly announces the further proposition that such men have no right to conspire and combine together, not only for the purpose of securing better conditions and wages, and quit service if not secured, but to go further for the purpose of preventing the employer from supplying the places vacated with other employés, who are ready and willing to take their places; that they have no right to combine and confederate together for the purpose of wantonly injuring and destroying the property of their employer, and to obstruct and interfere with his dominion over and control of his private property. An act which, if done by an individual, may be lawful, may become quite a different thing when undertaken to be done by a confederation among many, having for its inspiration the purpose of injuring and destroying the property of another, by preventing him from prosecuting his business by taking into his service others to supply the places of those who voluntarily have gone out. So the learned justice says:

"It seems entirely clear, upon authority, that any combination or conspiracy upon the part of these employés would be illegal, which has for its object to cripple the property in the hands of the receivers, and to embarrass the operations of the railroad under their management, either by disabling or rendering unfit for use the engines, cars, or other property in their hands, or by interfering with their possession, or by actually obstructing their control or management of the property, or by using force, intimidation, threats, or other wrongful methods against the receivers or their agents, or against employés remaining in their service, or by using like methods to cause employés to quit, or prevent or deter others from entering the service in place of those leaving it. Combinations of that character disturb the peace of society, and are mischievous in the extreme. They imperil the interests

of the public, which may rightfully demand that the free course of trade shall not be unreasonably obstructed. They endanger the personal security and the personal liberty of individuals, who, in the exercise of their inalienable privilege of choosing the terms upon which they will labor, enter or attempt to enter the services of those against whom such combinations are aimed. And as acts of the character referred to would have defeated the proper administration of the trust estate, and inflicted irreparable injury upon it, as well as prejudiced the rights of the public, the circuit court properly framed its injunction so as to restrain all such acts as have specifically been set forth, as well as combinations and conspiracies having the object and intent of physically injuring the property, or of actually interfering with the regular, continuous operation of the railroad."

Further on, he says:

"In our consideration of this case, we have not overlooked the observation of counsel in respect to the use of special injunctions to prevent wrong which, if committed, may be otherwise reached by the court."

Then, after observing that this jurisdiction of a court of equity should be cautiously and conservatively exercised, said:

"It will be refused until the court is satisfied that the case before it is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act. In such a case the court owes it to its suitors and its own principles to administer the only remedy the law allows, to prevent the commission of the act. The authorities all agree that a court of equity should not hesitate to use this power when the circumstances of the particular case in hand require it to be done, in order to protect rights and property against irreparable damages by wrongdoers."

Then, quoted from Mr. Justice Story, the following:

"The jurisdiction of these courts thus operating by special injunction is manifestly indispensable for the purpose of social justice, in a great variety of cases, and therefore should be fostered and upheld by a steady confidence."

The court then concludes with the statement that no other remedy than that of injunction, to meet such extraordinary conditions of affairs, was full and complete for the protection of the property, and "for the preservation of the rights of the public in its due and orderly administration by the courts." The court then says:

"That some of the acts enjoined can criminally subject the wrongdoers to actions for damages, or to criminal prosecution, does not therefore, in itself, determine the question as to interference by injunction. If the acts stop at crime, or involve merely crime, or if the injury threatened could, if done, be adequately compensated in damages, equity would not interfere. But as the acts threatened involve the irreparable injury to and destruction of property, as well as continuous acts of trespass, to say nothing of the rights of the public, the remedy at law would have been inadequate."

This doctrine was long ago announced by so distinguished a jurist as Mr. Justice Story, who said:

"If, indeed, courts of equity did not interfere in cases of this sort, there would, as has been truly said, be a great failure of justice in this country."

As said by Judge THAYER in granting this provisional injunction:

"A combination whose professed object is to resist the operation of railroads whose lines extend from a great city into adjoining states, until such roads accede to certain demands made upon them, whether such demands are in themselves reasonable or unreasonable, just or unjust, is certainly an unlawful conspiracy in restraint of commerce among the states; and under the laws of the United States, as well as at common law, men may not conspire to accomplish a lawful purpose by unlawful means."

It would present a most anomalous state of affairs, in a country like this, if men, because of some supposed or real grievance with an employer in a distinct business, should be permitted to confederate and conspire together for the purpose of coercing the employer into acceding to their demands, and, as a means to a specific end, tie up and stop independent railroads extending from the Pacific coast to the Lakes on the north and northeast, deaden all the engines on the tracks; thereby intercepting the transportation of passengers and the necessary supplies passing from one state to another, and stop the shipment of cattle, sheep, hogs, corn, wheat, oats, fruits, and vegetables. It is impossible to state in language the far-reaching destructiveness and ruin of such a scheme, if permitted to proceed to accomplishment. The business of this country has adjusted itself to operations of interstate commerce. Large communities of people are dependent for the necessaries of life upon the agricultural products of other communities. While we have a state here with a productive energy and capacity for producing nearly all the necessaries of life, yet, because of the fact that other localities can produce with less labor and more profit certain supplies than the local community, people forbear giving attention to the production of articles which they can thus obtain more cheaply and readily, and depend therefor upon other communities, and the railroads for transporting such supplies from one state to another. If persons may combine and confederate together to stop the railroad trains from passing from one city and one state to another, it is easy to be seen how quickly and readily they could produce ruin, famine, and death in our great cities. They could cut off such necessaries for the sustenance of life as an adequate supply of coal, and in one month, or less, produce a coal famine in city and country. It certainly ought to be permissible to the government, representing the whole people, to interpose, to preserve and protect the public life and the public health. The framers of the federal constitution builded wisely when they gave to congress control over our interstate commerce. With prophetic eye, they looked far into the future of their country, and foresaw the development of its commerce, and the absolute necessity of the freedom of commercial intercourse between the different communities extending from ocean to ocean. The fact that congress did not enact the statute above recited until 1890, is no argument against the existence of its power. Many powers lodged by the constitution in the legislative department long lie dormant, until the exigency arises to invoke them into activity. As said by Mr. Justice Miller in Sawyer v. Hoag, 17 Wall. 620:

"When we consider the rapid development of corporations as instrumentalities of the commercial and business world in the last few years, with the corresponding necessity of adapting legal principles to the new and varying exigencies of this business, it is no solid objection to such a principle that it is modern, for the occasion for it could not sooner have arisen."

Congress passed the act of 1890 in response to the public necessities. And as the sequel proved, in the great extremity to which the country was forced last summer, the framers of the law "builded wiser than they knew." The furious assaults made on the federal

judiciary in connection with this trouble, for grasping jurisdiction, are wholly unwarranted, in view of the express authority given the courts by said act of congress. The federal courts are the creation of the federal constitution, and the laws made in pursuance thereof. It is their office to execute, and not make, the laws. They possess just such powers, and all the power and jurisdiction, as are conferred on them by the supreme law of the land. And when they come in the exercise of the jurisdiction with which they have been clothed by an express act of the federal legislature, and grant injunctions, as they did last summer, against unlawful combinations of men, to restrain and prevent the operations of the unreasoning and unappeasable spirit of the mob, in the protection of the freedom of trade and commerce, to break the blockades on the public highways so as to open up travel and the transportation of the United States mails, and restore by civil processes the healthful glow and flow of a nation's commerce, they come as servitors, within the meaning of the preamble to the federal constitution, "to establish justice," and to conserve the public welfare. In such office they deserve the commendation of all good men, rather than the hurtful criticisms to which they have been exposed. It is well, in such a crisis, that the American people should be reminded that this is a government of law, and not of the tumultuous assembly controlled by one spirit to-day, and not by another to-morrow.

Objection is made in the demurrer and the brief of counsel that the restraining order granted in this case went against parties not named specifically in the bill and the restraining order. The language of the provisional order in this respect is as follows:

"It is ordered that the aforesaid injunction, with writ of injunction, shall be in force and binding upon such of the defendants as are named in said bill, * * * and shall be binding upon such defendants whose names are not stated, but who are within the terms of this order."

The order further directed that the injunction should be operative upon all persons acting in concert with the designated conspirators, and under their direction and control, and where parties were not named especially in the writ, but were found to be acting in concert with and under the direction of the alleged conspirators, and commit some act in furtherance of the conspiracy, then the marshal should serve the writ upon them, and if, after service of the writ upon them, they did any act in violation of the injunction, they would come within the terms of the restraining order. This, I think, it is competent for the court to do, under section 5 of the act aforesaid, and that it was conformable to the custom and usage of courts of equity, where there are engaged such large numbers of unknown persons in such unlawful conspiracy. As the order of injunction was not to become operative upon them until served with a copy thereof, it does not lie in their mouths to question the regularity of the proceeding. My conclusion is that the bill is sufficient, and the demurrer is overruled.