AMERICAN STEEL & WIRE CO. v. WIRE DRAWERS' & DIE MAKERS'
UNIONS NOS. 1 AND 3 et al.[1]

(Circuit Court, N. D. Ohio, E. D.    October 18, 1898.)

No. 5,812.

1. INJUNCTION—RIGHT TO USE OF STREETS—OBSTRUCTING ACCESS TO PREMISES.
    The owner of a house, whether a dwelling, store, or mill, has a distinct
    right of property in the streets and highways adjacent and used as ap-
    proaches to it; and a use of such streets or highways by others for the
    purpose of forcibly preventing access to such house is an unlawful interfer-
    ence with such right, and constitutes a private nuisance, which may be
    abated by injunction.

2. SAME—SUIT BY CORPORATION—DEFENSE OF UNLAWFUL TRUST.
    A claim that a corporation is a trust and illegal cannot be made collat-
    erally as a defense to a suit by the corporation to enforce a private right
    by injunction.

3. SAME—STRIKES—INTERFERENCE WITH RIGHT OF PROPERTY AND CONTRACT.
    Defendants, who had formerly been employés of plaintiff, in. its mills,
    as wire drawers, but who had gone out on a strike, for more than two
    months had patrolled the streets adjacent to plaintiff's works both day
    and night, keeping within call at all times a large body of men, for the
    claimed purpose of dissuading other workmen from taking employment in
    their places.    The evidence showed but a single instance during that time
    in which defendants stood aside and permitted a wire drawer to enter the
    mill, and that instance was disputed, although in a number of instances
    workmen attempted unsuccessfully to enter, and several conflicts occurred
    between them and the strikers.    Held, that such action was an unlawful
    interference by defendants with plaintiff's rights of property and freedom
    to contract, which entitled plaintiff to relief by injunction.

4. SAME—UNLAWFUL FORCE AND VIOLENCE.
    It is not necessary that actual batteries or assaults shall be committed, to
    constitute unlawful force or violence which will afford ground for relief
    by injunction; but a display of force sufficient to deter others from at-
    tempting to exercise a lawful right, and intended to accomplish that pur-
    pose, is sufficient.

## On Application for Injunction.

The proof in this case establishes that the former operatives of the plaintiff's
mill have organized a strike to secure an advance of wages to a scale that they
have endeavored to induce the plaintiff to accept before they will work for it.
The strike has been conducted under the leadership of Walter Gillette and
others, made parties to the bill.    He was not one of the striking operatives,
but a member of one of the unions, and an official of the executive council of
the federation to which the unions belong.    He instigated the movement,
and substantially organized it.

It is not necessary to consider the causes for the strike, its scope or object,
for it must be conceded that the men had a right to strike, no matter for what
cause, good or bad; nor to consider whether it was a wise or judicious move-
ment or not.    That matter does not concern  the proceedings before the court,
but only the men themselves, and therefore all the affidavits upon that sub-
ject are quite irrelevant.    The striking operatives had no fixed contract for
their labor; nor did those who remained, nor did those who desired to enter
the mill to work for the plaintiff, have such contracts.    All were working, or
proposed to work, for daily or weekly wages, and might quit or work at will,
and might be so discharged.    The two Wire Drawers' Unions made defend-
ants are not shown to have been otherwise engaged than by lending their

---

[1] In the case of Lyons v. Wilkins, the English court of appeal rendered, on December 20,
1898, a decision which is directly in line with the decision of Judge Hammond.    It was held that
an injunction would be granted to restrain persons from watching or besetting the works or
place of business of an employer, or person working for him, for the purpose of persuading or
otherwise preventing persons from working for him, or for any other purpose, except merely to
obtain or communicate information.—[Ed.

sanction and co-operation to the larger movement, embracing many operatives who were not members of the union. The plan adopted was to organize for the movement the whole body of wire drawers employed in the mill, unionists and nonunionists, by assembling them in mass meeting. The strike having been set on foot by such a meeting, it was continued by holding almost daily a mass meeting at a certain hall near by, which meetings have continued from the beginning of the strike, about the 1st of August last, until the present time. The proof does not disclose with any detail the organized plan of campaign adopted by these meetings, but it does appear that Gillette and the other leaders, one or more, were always on hand, as leaders, if occasion required; and the important feature of their plan was to patrol or picket the plaintiff's mill, not at any time by going on the premises, but around and near to them, and especially on all the streets and other approaches to them, more or less remote, but always near enough to intercept all wire drawers going to the mill to engage in work; and this picket or patrol was kept up day and night, continuously, but not always to the same extent, either as to their location, the number on duty, or the vigilance employed. The plaintiffs contend, and their affidavits tend to prove it, that the purpose of this patrol was to forcibly prevent, if force were necessary, all persons willing to go to work in the mill from entering it for that purpose; while the defendants contend, and their affidavits tend to prove it, that the only purpose was to meet these men, and "by argument and persuasion induce them not to take the strikers' jobs, but to join the strikers, by abstention from work, at least, until all could go to work on the advanced scale proposed by the strikers." Mostly, the affidavits only express the opinions of the affiants that the conduct complained of by the plaintiff's affidavits amounted only to "argument" or "persuasion." They do establish, undoubtedly, that the strikers did intend to use peaceful argument in furtherance of their desire to prevent the outsiders from going to work in the mill; and they deny that any violence was used, except such as was provoked by aggressive action on the part of the "strike breakers,"—words which will be borrowed from the mouths of the defendants and their counsel, and used here to designate all who insisted on going into the mill to work. And it is the belief of the defending affiants that this aggression by the strike breakers was instigated and organized by the plaintiff for the purpose of breaking the strike by violence, or to bring about a condition which would justify this application for an injunction, and that it was the preliminary fabrication of evidence to that end. It is not denied that conflict, turbulence, and violence have occurred on several occasions in the streets near the mill, especially on August 28th, September 5th, 12th, 19th, 20th, and 21st, and October 5th and 6th; but the affiants for defendants swear that in every instance this was provoked by the strike breakers, and not brought on by the strikers. The affidavits of the plaintiff put the blame on the strikers. The most formidable of these conflicts was that of September 19th, which had some special features, but otherwise may be taken as in some degree representing the others, so far, at least, as it indicates the defendants' plan for maintaining their strike, and confessedly is the one wherein the aggression of the plaintiff's strike breakers most decidedly appears, and most opprobriously, in the view of the defendants and their counsel.

There is in the city of Cleveland a settlement of Poles, called the "Polack Settlement," wherein resides a Catholic priest, now out of harmony with his former church, said by defendants to have been excommunicated; but this is denied by him. There also resides there one Paulowski, seemingly a very determined and belligerent person. The priest has an independent congregation of his own, and it is testified that about 40 of them are wire drawers formerly employed in the plaintiff's mill; there are also in the congregation or settlement other wire drawers,—among them, Paulowski,—who had worked for plaintiff, but were not so employed at the time or immediately before the strike. Paulowski is denounced by the defendants' affidavits and by their counsel as a "professional strike breaker"; that is, one who for hire will head a gang of men proposing to work, and lead them in assaults upon the strikers to clear the way to the factories, or a gang of "toughs" pretending to want work,—it being immaterial to this soldier of fortune, so he be paid for the enterprise. The proof does not substantiate this character for the man. He denies it, and swears that he really wished to go to work,

taking advantage of this opening, as did his neighbors and companions, who needed the wages to be earned. He made several other attempts to reach the mill, and with much smaller groups than were engaged in the events of the 19th of September. The chief manager of the plaintiff company, some of the superintendents and foremen, visited this settlement, had conferences with the priest, Paulowski, and others, with the general result, not denied, that an arrangement was made whereby the priest advised his parishioners to avail themselves of the offered opportunity to go to work in this wire mill. Some 50 of them addressed a petition to the mayor, announcing the desire to go to work, asserting their need of the wages, and asking for police protection in reaching the mill against the anticipated obstruction of the streets by the strikers. The priest and others with him also called on the superintendent of police, showed him the petition and affidavits of assaults that had been made, and requested police protection. The superintendent told them that he got his orders from the mayor, and advised that he be seen. They presented the petition and affidavits to the mayor, who told them he would look the matter over, and see that the protection should be there. They then advised him that they would make an attempt to go to work on the following Monday, the 19th. On that morning about 15 of the Polacks, in company with Paulowski, attempted to go to the mill, but were met as they approached on the streets by a body of strikers, assembled by signals or preconcerted arrangement, variously estimated at 50, 70, and 100, or more. A fight ensued. There was only one policeman present, on the regular beat, though there is proof that three others were there in citizens' clothes, which is, however, denied, and the fact is not clearly established. The respective affidavits seek to blame the other side for beginning this combat. One of the strike breakers, who was an employé trying to go to his work, was arrested, but there was no other arrest. The strikers prevailed, and the Polacks did not reach the mill. Immediately after this disturbance one of the attorneys and the manager of the plaintiff's company called on the mayor, and again demanded police protection. They subsequently addressed to him a letter, advising him of the situation, and informed him that on the next day another attempt would be made by a body of men seeking employment, and again demanded proper police protection. To this the mayor made a somewhat diplomatic reply, denying that there was any occasion for police interference, suggesting that a meeting be had between the parties to adjust the difficulties, and expressing his belief that, if the plaintiff were willing to do "the right thing," the whole question might be easily settled. On the next day, September 21st, a similar body of men, under the leadership of Baackes, the general manager, and Ney, the superintendent, of plaintiff's mill, attempted to reach the mill, and were again obstructed by a large body of strikers, quite 200 strong, under one Russ, as their leader, whereupon "a scuffle ensued," and the strikers again succeeded in preventing the men from going to work. The plaintiff's affidavits complain of the perfunctory and inefficient action of the single policeman on his regular beat to help them through, but it is explained on the other side that he did all that the occasion demanded, as there was no violent fighting, requiring arrests. The minor disturbances, taken together with these and the other proof, show that the plan of operations constantly employed by the strikers was to meet every body of wire drawers, every group, or any single man, with their pickets or patrols, and if necessary with a larger body, always available by signal or otherwise from the large number of strikers assembled at convenient places adjacent, and thus to argue with and persuade them, according to their story, or to obstruct and force them away from the mill, according to the story of the plaintiff; and that this has been kept up since the strike was inaugurated, for more than two months. Except a disputed occurrence with one Willman, described in Cliff's affidavit, introduced as counter to that of Willman, there is no instance authenticated by affidavit of any strike breaker or other wire drawer being let into the mill by the strikers' standing aside and allowing him to enter for the purpose of going to work after the argument or pleading with him had failed. This was not a general strike of all the operatives in the mill, but only of those in the wire-drawing department; and those not in that department, or wishing to work elsewhere in the mill, came to and went from the mill without interruption of any kind. This statement requires modification, to the extent that Gillette, and perhaps others, testify that

within the last week preceding the hearing of this application there had been some relaxation of vigilance, and some wire drawers have gone into the mill to work without any attempt to dissuade them. It is in proof that the plaintiffs have maintained inside the mill some 50, more or less, of workmen, who eat and lodge there, for fear, as they swear, of bodily injury, or successful resistance to their re-entry, if they go out. Again, the affidavits of defense assert that this is unnecessary, and only a scheme of plaintiffs to fabricate a condition favorable as evidence to this application for an injunction. It is also shown by the proof that, by stealth of one kind and another, workmen enter the mill, either by evading the pickets, or sometimes by circumventing them after an attempted obstruction, as in the case of those who swear that after being driven away they reached an entrance in a closed carriage. If it can be at all material for any purpose, it may be stated here that, when the strike commenced, of the 230 wire operatives there were 121 Germans, 42 Poles, 19 Americans, 10 Swedes, 9 Irishmen, 4 Englishmen, 3 Bohemians, 3 Armenians, 2 Hungarians, 1 French-American, 1 English-American, 1 Irish-American, and 1 Russian. Since the movement commenced there have been and are employed 25 Germans, 28 Poles, 5 Turks, 2 Englishmen, 13 Armenians, 2 Welshmen, and 2 Bohemians,—a total of 77. It appears that the plaintiffs persistently have refused to recognize the unions, their officers or committees, in conference or otherwise, to discuss the scale of wages tendered on either side, but have expressed a willingness to confer with the men themselves on that subject.

The police officers testify, as do other witnesses cross-examined, that this is the "most orderly strike" ever known to Cleveland, though plaintiff's witnesses disagree about that. These officers, also including the sheriff and the mayor, by affidavit and orally, swear that they are, and ever have been, ready, willing, and able to perform their duties, respectively, in preserving and protecting the public peace and rights of property. The sheriff says that no application has ever been made to him by the plaintiff, nor has he been notified of any breach, or threatened breach, of the peace. The mayor says that he has fully investigated the complaints made to him, and is thoroughly satisfied that there was never any occasion for his interference; that there existed no case of riot or like emergency; that there was no body of men around, or in the vicinity, acting together with intent to commit a felony, or to offer violence to any person or property, or by force and violence to break or resist the laws of the state; that there was never any reasonable apprehension that any breaches of the peace would be committed by the former employés of the plaintiff; and that in his belief a force of police was wanted by the plaintiff to intimidate "persons rightfully upon the street," and who were committing no breach of the peace, or intending to do so. It is also in proof that the mayor told the plaintiffs when they applied to him that "they should apply for an injunction." The two chief officers of the police testified orally that there never has been a condition which should deter a "determined" or "courageous" man from making his way to the mill, if he wanted to work. It was asked, in cross-examination of the plaintiff's officers engaged in these occurrences, why they did not take the men they wished to convey into the mill by boats on the lake, or in cars on the railroad, instead of through the streets; and the answer was that they had the right to use the streets for that purpose, as one of the ordinary and customary uses of streets leading to their mill. The attention of the court was called to section 3096 of the Revised Statutes of Ohio, authorizing the governor, the sheriff, the mayor, or any judge of a state or of the United States, to summon the militia to act in aid of the civil authorities in suppressing any tumult, riot, mob, or any body of men acting together with intent to commit a felony, or to do or offer violence to person or property, or by force or violence to break or resist the laws of the state, or when there is any apprehension thereof. This bill was filed, alleging the facts in too general, but sufficient, terms, perhaps, and that the defendants have conspired together to wrongfully injure the plaintiffs' business and property, by illegally molesting and obstructing them in supplying the places of the strikers with other laborers who were anxious to be employed, and were willing to accept the wages offered them, but who were intimidated by the defendants, and not allowed to enter the mill for that purpose. It prays

an injunction against these alleged trespassers upon their right to contract with others than the strikers for the labor necessary to carry on their business. The case is now heard upon an application for a preliminary injunction.

Squire, Sanders & Dempsey, for complainant.

Arnold Green and M. A. Foran, for defendants.

HAMMOND, J. The foregoing is a sufficient and fair summary of the facts established by the proof. The court is not now engaged, as a criminal or police court, in trying offenders for assaults and battery, nor for engaging in tumults, riots, or mob violence, wherefore much of the testimony on both sides is quite irrelevant and inappropriate to this inquiry. It is not one of the present duties of the court to locate the blame for the occurrences which have been detailed in the affidavits and by the witnesses; and, indeed, either side may be blameworthy, or both, and that fact should not affect the question to be now decided; neither is the court properly concerned at this time about the rightfulness or wrongfulness of the strike, in relation to the causes which brought it about; and therefore the foregoing statement of facts does not at all deal with the details of the transactions and occurrences so voluminously set out in the proof. The only question is, does this proof, as a whole, justify a reasonable apprehension on the part of the plaintiffs that the defendants, in maintaining their strike, will illegally disturb their business and injure it by unlawful acts of violence and intimidation of outside laborers—"scabs," if you please—willing to work for the plaintiffs at the wages which they offer? Even "scabs" and those who employ "scabs" in time of a strike have rights which the strikers are bound by the law to respect. The most important of these rights is an unobstructed access to the place where the work is to be done, over the streets and highways by which it is to be approached. Nor is this freedom of access at all inconsistent with any right the strikers have to use the same streets and highways for the lawful conduct and maintenance of their strike by intercepting any one going to work in their place for the purpose of peaceful entreaty or argument against supplanting them. One authenticated instance in this proof where the strikers, meeting a single "scab," or a group of them, or an organized body of them, had stood aside, opened up the street, and allowed him or them to pass to the mill without more ado, after the entreaty or argument had failed to convince, would be worth more, as a matter of evidence showing the good faith of the strikers in their assertion that they were on the street only for an opportunity of entreaty and argument, than all the affidavits filed in this case. If the strikers, after their victory over Paulowski and his body of "strike breakers," had only lined themselves on each side of the street, and permitted them to go to work at the mill, that would have been conclusive evidence of their honesty and good intentions in the matter of confining their operations to entreaty and argument. So, of the struggle on the next day but one, when the officers of the plaintiff company led the "strike breakers," and of all the other occasions when workmen attempted to go to the mill notwithstanding the entreaty and argu-

ment which had been presented to them.  That was precisely what the men wishing to go to the mill had a right to do after they had lingered or been detained long enough to receive the argument and entreaty of the strikers not to supplant them, that was precisely what the plaintiffs had a right to demand, and that right is guarantied to them by the law of every free country where the right to work as one pleases, and to contract for labor as one chooses, is protected by law.  It is the right not so much of property as of that liberty which every man enjoys in this country as his birthright; which is not confined to political rights alone, but extends as well to personal activities in and about one's daily business, be he laborer or capitalist; it is this right which lies at the foundation of the strikers' own freedom when they would work or refuse to work on any terms but their own; it is a right the striker lawfully cannot deny to the "scab,"—the right to pass freely through the streets and highways to his work.  In this country this right to contract in business is a constitutional freedom, which not even state legislatures can impair; and certainly not strike organizations, for surely they cannot lawfully do what the legislature may not.  Allgeyer v. Louisiana, 165 U. S. 578, 589, 590, 17 Sup. Ct. 427.

It was frequently urged in argument that the strikers have a right to be on the streets; and so they have, so long as they do not trespass on the right of others to use them.  The right of the use of streets by any one is a qualified right.  The owner of a house, be it dwelling house, store house, or mill house, has a distinct right of property in the streets adjacent thereto, and used as approaches to it.  It is the right of access,—free and uninterrupted ingress and egress.  Any one who uses the streets must use them subject to this right of the householder; and there is not a particle of difference in respect of this between a dwelling house and a mill house or large factory employing large bodies of men, who always go to the polls and vote at elections, and sometimes go out on a strike.  Nor is the freedom of contract and right of access through the streets to one's work at all affected by assumed peculiarities of conditions attending the struggles of men in the economic conflicts between laborers and capitalists, nor by any considerations of public policy in respect of these conflicts.  In one of the great cases to be cited presently, what was said by an English judge is quite pertinent to this matter of strikes and boycotts, and interfering between employer and employé, namely, that public policy is "an unruly horse, and, when once a judge is astride it, he may be carried far away from sound law."  If any one violate the right of the householder to the streets that are appurtenant to his property, as a part of it, by impairing his ingress and egress, he has a civil action, and he may also abate it by injunction in equity as a private nuisance.  In re Debs, 158 U. S. 564, 587, 15 Sup. Ct. 900; Griffing v. Gibb, 2 Black, 519; Railroad Co. v. Ward, Id. 485; Hart v Buckner, 5 C. C. A. 1, 54 Fed. 925; Story, Eq. Jur. (13th Ed.) §§ 920–924, and note a; 924a–927, and note 2, citing cases, 928, 929; Daniell, Ch. Prac. (5th Ed.) 1635–1639, and notes 3, 4; Cooley, Torts

(2d Ed.) 732–736, and note 7, citing cases, 737, and note 2. It is just as much a nuisance to block up the street and impair the right by the continual presence of bodies of men, great or small, who obstruct the ingress and egress, as it would be to build barricades and embankments in the street. In re Debs, supra. There can be no denial of this; and, when the blockading is done for the especial purpose of impairing the ingress to a particular house, it is directly a nuisance, which may be abated by injunction, if necessary. Id. This is sound law, from which no unruly horse of public policy should carry a judge any distance at all, no matter how ably it is urged upon him by learned and eloquent counsel pleading for the rights of labor as against capital, corporations, and despised foreigners, who organize "scabs" to resist the strikers in favor of odious trusts.

The defense that the plaintiff is a trust was sufficiently disposed of at the hearing by the statement that it cannot thus be made,—collaterally. If ousted by a judicial decree declaring it a trust, at the suit of the attorney general, then possibly it might be pleaded, but not now and here. Moreover, if it be a trust, it should be none the less odious when it yields to the laborers, and pays the wages they demand, or employs them before the strike begins, than when the strike is fully under way. Nor should it be any more odious because of the strike.

The whole fallacy of the defense against this bill and the proof offered to sustain it lies in a convenient misapprehension or a necessary misunderstanding of the character of that force or violence which all agree is not permitted in the conduct of a strike. It seems to be the idea of the defendants that it consists entirely of physical battery and assaults, and that if these appear in the proof, and they can be justified as they might be on a criminal indictment or in a police court, that ends the objection, and the justified assaults and batteries will not support an injunction. The truth is that the most potential and unlawful force or violence may exist without lifting a finger against any man, or uttering a word of threat against him. The very plan of campaign adopted here was the most substantial exhibition of force, by always keeping near the mill large bodies of men, massed and controlled by the leaders, so as to be used for obstruction if required. A willing wire worker, but a timid man, would be deterred by the mere knowledge of that fact from going to the mill when he desired to go, or had agreed to go, or, being already at work, feared to return through the streets where the men were congregated, or, having started, would turn back, fearing the trouble that might come of the attempt. Such a force would be violence, within the prohibition of the law; and its exhibition should be enjoined, as violating the property rights of the plaintiffs in the streets, their liberty of contracting for substituted labor, and the liberty of the substitutes to work if they wished to accept the lowered wages, and to pass through the streets to their work.

It only remains to cite the cases which establish this protection for the plaintiffs and their substituted laborers beyond all controversy.

But I wish to say particularly that this case is undeniably, in my judgment, supported most substantially by the dissenting opinions of Mr. Chief Justice Field and of Mr. Justice Holmes in the Massachusetts case, which were so earnestly relied on in the argument for the defendants; and I should think it would come within the most recent opinion of Judge Valliant in the Missouri case, a note of which was read, with commendation by counsel, from the Albany Law Journal. But the Debs Case, by the supreme court of the United States, is all-sufficient for every court. It settles every suggested defense against the defendants, and the writ of injunction approved in that case could be adopted almost verbatim in this, mutatis mutandis. In re Debs, 158 U. S. 564, 15 Sup. Ct. 909; Id., 64 Fed. 724; U. S. v. Kane, 23 Fed. 748; Casey v. Typographical Union, 45 Fed. 135; Cœur D'Alene Consolidated & Mining Co. v. Miners' Union of Wardner, 51 Fed. 260; Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 730, 746; U. S. v. Workingmen's Amalgamated Council of New Orleans, 54 Fed. 994; Blindell v. Hagan, 54 Fed. 40; Id., 6 C. C. A. 86, 56 Fed. 696; Farmers' Loan & Trust Co. v. Northern Pac. R. Co., 60 Fed. 803; Thomas v. Railway Co., 62 Fed. 804; Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310; U. S. v. Elliott, 64 Fed. 27; Ex parte Lennon, 12 C. C. A. 134, 64 Fed. 320; U. S. v. Agler, 62 Fed. 824; Oxley Stave Co. v. Coopers' International Union of North America, 72 Fed. 695; Id., 28 C. C. A. 99, 83 Fed. 912; Elder v. Whitesides, 72 Fed. 724; Wire Co. v. Murray, 80 Fed. 811; Mackall v. Ratchford, 82 Fed. 41; Railway Co. v. McConnell, 82 Fed. 65, and note, page 87; Moores v. Bricklayers' Union, 23 Wkly. Law Bul. 48; Vegelahn v. Guntner (Mass.) 44 N. E. 1077; Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307; Murdock v. Walker, 152 Pa. St. 595, 25 Atl. 492; China Co. v. Brown, 164 Pa. St. 449, 30 Atl. 261; Crump's Case, 84 Va. 927, 6 S. E. 620; Barr v. Council, 53 N. J. Eq. 101, 30 Atl. 881; State v. Stewart, 59 Vt. 273, 9 Atl. 559; People v. Wilzig, 4 N. Y. Cr. R. 403; Cogley, Strikes, 256; Reynolds v. Everett, 144 N. Y. 189, 39 N. E. 72; Curran v. Galen, 152 N. Y. 33, 46 N. E. 297; Shoe Co. v. Saxly, 131 Mo. 212, 32 S. W. 1106; Marks v. Paft, 58 Alb. Law J. 112, note; Steamship Co. v. McGregor [1892] App. Cas. 25; Allen v. Flood [1898] App. Cas. 1.

Very much was said in argument about the Turks, Armenians, and Polacks employed as substituted workmen by the plaintiff, but the facts show that it has little foundation in fact, and should have not the slightest influence on this question, if it were true. There is no distinction in this country in the legal rights of classes, based on race or nationality, and all stand upon an equal footing in this respect. Foreigners are no longer treated as outlaws or barbarians by any civilized nation, and, if racial distinctions were to be considered in this case, there is a very beggarly show of Americans or Anglo-Saxons; and both the strikers and the strike breakers are a rather conglomerate aggregation of many races, except the negroes, who are conspicuous by their absence.

The court called on counsel to submit a carefully prepared order for injunction, to enable it to see what is asked by the prayer of the bill, which is in rather too general language, perhaps. The draft sub-

mitted is satisfactory, and the injunction will be granted.     Ordered accordingly.

Mr. Green:     I suppose it is limited to those against whom there is some evidence.

The Court:     No.     That is disposed of entirely in the opinion that has just been filed on overruling your motion to dismiss as to those parties.     I have not read in your hearing that opinion, but it treats fully of that subject; and there will be no dismissal as to those parties, and no attention paid to the question of service.

Mr. Green:     I wish to say this:     There are comparatively few of these defendants that are members of the union, and as to a large number of those persons there was no mention whatever in the evidence.

The Court:     In the supreme court of the United States—in the case of Ex parte Lennon, 54 Fed. 746, decided by Judge Ricks, and which afterwards went to the court of appeals and was there affirmed (12 C. C. A. 134, 64 Fed. 320), and then to the supreme court, where it was again affirmed (17 Sup. Ct. 658)—an injunction was held binding against a man who never was a party to the suit, and upon whom no service of process was ever made.

Mr. Green:     That was in a contempt proceeding.

The Court:     That is a test of it.

Mr. Green:     I mean, against the men who answered separately and individually, that had nothing to do with it, and against whom there is no evidence,—I ask, will there be an injunction?

The Court:     It will run against all parties to this suit, and all other parties who are liable to aid and abet them, according to the everyday practice.

Mr. Green:     I wish an exception entered in behalf of each one of the defendants separately; and I ask the court, and I understand it has, a separate finding of facts from its conclusion of law.

The Court:     It is not technically a finding of facts.     It is a summary of the facts as the court views the testimony.

Mr. Green:     Under our practice in the state courts—

The Court:     That has nothing to do with the federal court.     The practice in Ohio and the practice statutes of Ohio have no application in federal courts of equity.

Mr. Green:     If I prepare a finding of facts, can I obviate the necessity of carrying up all these affidavits?

The Court:     I could not do that.     I am following the strict, technical practice of a court of equity in this proceeding; and I am sorry that I have not read from the bench the other opinion, as counsel then would be better informed as to the views of the court upon the question now submitted,—the opinion upon the application to vacate the service upon these parties.

Mr. Green:     As I recollect the prayer offered by the other side, it does not reserve to the men the right to be upon the streets there, or go upon the street.     I think there was a reservation—

The Court:     When Mr. Green first arose, I was about to say that I have carefully considered the suggestion that he made in the brief

in that behalf, and the emendation suggested for this order; but I came to the conclusion that it was wise not to insert it, for the reason that any ignorant men who are to be dealt with by this process in the further progress of this cause might misunderstand such a reservation. The opinion of the court is clear enough in recognizing any rightful presence of the strikers on the streets, and it does not require any reservation to protect it. If any one in the further progress of this case should be charged with a breach of this injunction, if his presence on the street be rightful and not in violation of the rights of the plaintiffs or of the substituted workmen, there could be no judgment against him on a proceeding for contempt; so the question, technically, only arises then. Therefore the application to add what Mr. Green has suggested is not granted, and the order will be entered as it has been drawn by counsel for the plaintiffs. I think that is a very carefully drawn order, and that it meets the exigencies of the situation.

Mr. Foran: I understand the court in his opinion reserves the right to any man, irrespective of this opinion, to talk to another man upon the street anywhere in a peaceable and quiet manner.

The Court: Yes, of course. If the opinion is understood, the court distinctly announced that. The constitution of the United States protects him in that. The only question here is as to the form of the order, and I think this, as I said before, is carefully drawn, and does not trench upon that right, and it will be entered as it has been drawn.

The court thereupon directed the following order to be entered:

The American Steel & Wire Company, Complainant, v. Wire Drawers' & Die Makers' Union No. 1, of Cleveland, Ohio, Walter Gillette, et al., Defendants.

### Order.

### No. 5,812.

This cause came on for hearing upon the bill of complaint, and complainant's application for a temporary injunction, upon the answers of certain of the defendants, and affidavits filed on behalf of complainant and defendants, and the testimony by way of cross-examination of certain of the witnesses in open court; and the court, being fully advised in the premises, finds that the complainant is entitled to a temporary injunction as follows:

It is hereby ordered, adjudged, and decreed that the Wire Drawers' & Die Makers' Union No. 1, of Cleveland, Ohio, Walter Gillette, its president, and Wire Drawers' & Die Makers' Union No. 3, of Cleveland, Ohio, Fred Walker, its president, and the officers and members of said unions, and each and all of the other defendants named in the complainant's bill, and any and all other persons associated with them in committing the acts and grievances complained of in said bill, be, and they are hereby, ordered and commanded to desist and refrain from in any manner interfering with, hindering, obstructing, or stopping any of the business of the complainant, the American Steel & Wire Company, or its agents, servants, or em-

ployés, in the operation of its said American Mill, or its other mills in the city of Cleveland, county of Cuyahoga and state of Ohio, or elsewhere; and from entering upon the grounds or premises of the complainant for the purpose of interfering with, hindering, or obstructing its business in any form or manner; and from compelling or inducing, or attempting to compel or induce, by threats, intimidation, persuasion, force, or violence, any of the employés of the American Steel & Wire Company to refuse or fail to perform their duties as such employés; and from compelling or inducing, or attempting to compel or induce, by threats, intimidation, force, or violence, any of the employés of complainant to leave the service of complainant; and from preventing or attempting to prevent any person or persons, by threats, intimidation, force, or violence, from entering the service of complainant, the American Steel & Wire Company; and from doing any act whatever in furtherance of any conspiracy or combination to restrain either the American Steel & Wire Company or its officers or employés in the free and unhindered control of the business of the American Steel & Wire Company; and from ordering, directing, aiding, assisting, or abetting, in any manner whatever, any person or persons to commit any or either of the acts aforesaid. And the said defendants, and each and all of them, are forbidden and restrained from congregating at or near the premises of the said American Mill, or other mills of the American Steel & Wire Company in said city of Cleveland, for the purpose of intimidating its employés or coercing said employés, or preventing them from rendering their service to said company; and from inducing or coercing by threats said employés to leave the employment of the American Steel & Wire Company; and from in any manner interfering with the American Steel & Wire Company in carrying on its business in its usual and ordinary way; and from in any manner interfering with or molesting any person or persons who may be employed or seeking employment by the American Steel & Wire Company in the operation of its said American Mill and other mills. And the said defendants, and each and all of them, are hereby restrained and forbidden, either singly or in combination with others, from collecting in and about the approaches to said complainant's American Mill or other mills for the purpose of picketing or patrolling or guarding the streets, avenues, gates, and approaches to the property of the American Steel & Wire Company for the purpose of intimidating, threatening, or coercing any of the employés of complainant, or any person seeking the employment of complainant; and from interfering with the employés of said company in going to and from their daily work at the mill of complainant. And defendants, and each and all of them, are enjoined and restrained from going, either singly or collectively, to the homes of complainant's employés, or any of them, for the purpose of intimidating or coercing any or all of them to leave the employment of the complainant or from entering complainant's employment, and, as well, from intimidating or threatening in any manner the wives and families of said employés at their said homes.

And it is further ordered that the aforesaid injunction and writ of injunction shall be in force and binding upon each of the said defendants and all of them so named in said bill from and after service upon them severally of a copy of this order by delivering to them severally a copy of this order, or by reading the same to them; and shall be binding upon each and every member of said Wire Drawers' & Die Makers' Union No. 1, of Cleveland, Ohio, and Wire Drawers' & Die Makers' Union No. 3, of Cleveland, Ohio, from the time of notice or service of a copy of this order upon the said Walter Gillette and Fred Walker, and other members of said unions, parties defendant herein; and shall be binding upon said defendants whose names are alleged to be unknown from and after the service of a copy of this order upon them, respectively, by reading of the same to them, or by publication thereof by posting or printing; and shall be binding upon the said defendants and all other persons whatsoever who are not named herein from and after the time when they severally have knowledge of the entry of this order and the existence of this injunction.    This order to continue in effect until the further order of this court, and upon said complainant's entering into bond, in the sum of $2,500, conditioned for the payment of costs and moneys adjudged against them in case this injunction shall be dissolved.

And thereupon came said defendants by their counsel, and in open court gave notice of their intention to appeal this cause, and the court does allow said appeal upon the filing of an appeal bond in the sum of $1,000.

The reservation proposed by Mr. Green and refused by the court in the foregoing proceedings is as follows:

But it is no part of this order that any of the defendants shall be restrained or enjoined from inducing, persuading, or advising others, by peaceable means, and without threats, force, or intimidation, from leaving complainant's employment, or from entering into the employment of complainant.

### Addendum.

HAMMOND, J.    When the foregoing opinion was prepared to be read and filed, I deemed it best to cut out a part of it which had dealt with the eloquent appeal of counsel to avoid the possible driving of workingmen to anarchy by repeated interference of the courts with an economic struggle that it would be better to leave unrestrained, except by the ordinary processes of police protection, in keeping down tumults, violence, or riot in the streets or elsewhere, or by criminal prosecution where the right of trial by jury might operate.    The argument was based on a public policy to that end, more than on any denial of the authority of the court, as established by the precedents, and it seemed to me to belong rather to the domain of legislation than to that of judicial adjudication. Besides, it involved comments by the court upon the affidavits and oral proof of the police authorities, to the effect that this had been "the most orderly of strikes," and that they had been always ready,

able, and willing to afford police protection whenever that was required of them, by their own understanding of the conditions making it necessary to interfere. Inasmuch as it then seemed to me that such comments might be pretermitted, because the remedy in equity depended rather upon the fact of the efficiency of police protection than upon the state of mind of the police officials concerning the necessity for it; that was done, although it was the foundation of the argument for noninterference by the court that all essential restraint against violence could be found in the ordinary protection of the police and criminal laws. Upon reflection it now seems to me that it would have been better to have responded to that appeal of counsel to be let alone by the courts by showing why it was an impossible judgment by any court to withhold its protection under the circumstances of this case, when it was plain that the ordinary remedies suggested by counsel as sufficient were in fact inadequate to protect the plaintiff's rights of liberty and property, and as long as the police officials entertained the view of their duty in the premises which had been displayed by their affidavits. Therefore I have determined to reinsert that portion of the opinion which was left out, as follows:

It was suggested in argument that the courts should not interfere by injunction, but allow the employers and employed to maintain the struggle until one or the other should yield, and then such conflicts would become so costly to both sides that each would be willing to avoid strikes by adjustment. That would be a possible economic result, and yet if the parties, or either of them, have occasion to resort to the courts, or choose to invoke their aid in protecting their respective rights, neither can be repelled, and the courts must act. As before stated, considerations of public policy cannot govern them in respect of that, or direct their judgment. The public policy of keeping the courts always open for the redress of trespasses on personal liberty or property rights is quite as important as the other, and of older date. Moreover, it appears by this proof that the police authorities do not equally protect the contending parties, or permit them to "fight it out on fair terms in equal battle," by keeping the streets open for the equal use of transit to and from the mill, as they might. Of course, every official must decide his own responsibility, and regulate his action accordingly; but the affidavits of the mayor and the police officials, and their oral testimony, show that they do not consider that to be their duty, but only that they are required to suppress riot or tumult or personal violence by fighting. Indeed, the affidavit of the mayor is couched in almost the identical language of the statute of Ohio, read in our hearing by counsel for the defendants, authorizing the state and municipal authorities, including the judges, state and federal, to call out the militia under such circumstances (Rev. St. Ohio, § 3096), which shows that in the opinion of the mayor the police duty of protection against obstructed streets by bodies of men is limited to occasions when they fight, and when there is the same condition as that described in the statute for calling out the militia. It is complained by the plaintiffs that no arrests

were made in this case of any but their men, when fighting actually occurred; but that is immaterial here, since the right to an injunction is not dependent on any action or any failure to act by the police, as was decided in the Debs Case, to be hereafter cited. The director and superintendent of police take the same view of their duty as the mayor.   While expressing, as the sheriff does, a willingness and ability to "take care of the strike," as it was expressed by counsel, by all necessary protection against violence, their notion of what constitutes violence is shown by their testimony not to extend to any clearance of the streets from crowds constantly maintained there to block any approach to the mill by wire drawers desiring to go to work in place of the strikers.   One or both of these officials said there was never a condition existing when "a determined man" or "a courageous man" could not have made his way to the mill, if he desired to go; seemingly ignoring the timid or weak man needing their protection in that behalf; also ignoring the fact that protection mostly is needed by the timid, rather than the brave; and ignoring another fact, that the injury to one's business caused by hostile crowds in the street results more from the absence of those who stay away because of such crowds than from personal assault on those who are bold enough to encounter and contend with them for the right of passage through the streets.   At all events, it is admitted and shown by the proof that the police have not kept the streets clear during all these weeks.   If that had been done, it is not impossible that there would have been no occasion for the mayor's advice to the plaintiffs, as it appears in this proof, that they should "apply for an injunction," when they applied to him for that police protection to which their lawyer who conducted the correspondence thought they were entitled, but as to which he and the mayor so widely differed that counsel for the defendants characterized it as a play of political finesse between the two, as well as a strategic move on the part of the plaintiffs in preparation for this application for an injunction.   The court is not concerned with this view of the proof, except so far as it bears upon the general fact that the plaintiffs cannot reasonably expect police protection from such occurrences as are shown by this proof to have already taken place, and may therefore be held to have established a not unreasonable apprehension of their recurrence.   And I may also now add that the suggestion that the plaintiffs should introduce their substituted workmen surreptitiously, by way of the lake or by way of the rail, shows conclusively the misapprehension existing as to the right of the strikers on the street; as if it were a wrongful act to challenge their monopoly of the public streets, and as if they enjoyed, under the circumstances, some peculiar privilege, that the plaintiffs should recognize by adopting the extraordinary methods of ingress and egress suggested.   If counsel entertained this anomalous view of the situation and the relative obligations, presumably the strikers did also.

NOTE.   The form of the injunction order, substantially, is that of the Debs Case, 158 U. S. 564, 15 Sup. Ct. 900, at page 570 et seq., 158 U. S., and page

902, 15 Sup. Ct., changed only to suit the particulars of this case. My information always has been that that order was prepared under the supervision of the late attorney general, Mr. Olney, or received his sanction, as certainly it has since received that of the supreme court. This was so stated by counsel when the Debs strikers were enjoined in my own district. But whether that information was accurate or mistaken I have never known. The word "persuasion," so much objected to by counsel for the defendants, is used only in one of the clauses of the order, and its absence from the others is significant of its interpretation. It receives, also, a useful illumination from the opinions in the great case of Allen v. Flood [1898] App. Cas. 1, cited in the foregoing opinion, from the house of lords. In that case it was held, especially by some of the judges, that the walking delegate, Allen, had done nothing to induce the shipyard people to discharge the plaintiffs from any then existing contract which he had persuaded them to break, since there was in fact no contract between them, each having a correlative right to quit at will; or, indeed, that he had done nothing to disturb the relations of employer and employé, except to give the information, truthfully, upon which the employer acted in discharging the men. But the implied law of that case is that, if he had done either of those things otherwise than he did, there would have been a cause of action. It would have been then "wrongful," and in that sense legally "malicious." And, if a cause of action will lie, an injunction may be had whenever the equitable right also appears.